Attorney Donna A. Rotunno
140 South Dearborn Street, Suite 404
Chicago, Illinois 60603
Office: (708) 615-9400
Facsimile: (844) 397-0348

September 2, 2026

The Honorable James Peterson
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Re: *Stelio Kalkounos Sentencing Memorandum*

Dear Honorable Judge Peterson:

In anticipation of Kalkounos's sentencing hearing, the defense submits this letter and attached exhibits, including his written allocution, which the defense typed up for him. It is the website that Kalkounos used to meet women: Sweet & Discreet Meet. Two questions should decide where within the agreed 15-to-20-year range Kalkounos's sentence falls:

1. Why did Kalkounos fail to learn from his prior prison sentence and time on federal supervision?

2. Did Kalkounos engage in this activity to produce or receive child pornography, or was his conduct directed to a different end that also created these images?

Answering those points is not a matter of summary; it requires a closer examination of who Kalkounos is as a person, what led to his criminal conduct in 2006, what steps he took after his release from prison to reintegrate into society, and how quickly abandoning those disciplines led to his criminal thinking and relapse here.

## I. Kalkounos's background and history.

Maggie and George Kalkounos immigrated to the United States from Greece in the 1970s and settled in Fond du Lac, Wisconsin, where they started their family of four—Stelio and his younger brother Andy-John. His parents modeled a willingness to work hard. His father's first job upon arriving in the U.S. was washing dishes and bussing tables in a restaurant. By the 1980s, through relentless effort, he had worked his way into

owning restaurants in the Chicago suburbs. But his father's success did not immediately come with material benefit; he embraced a spirit of thrift.

That commitment to hard work shaped the family. His father worked seven days a week and was largely absent from his family's day-to-day life. As is often the case, a family business demands that the children contribute as well. Kalkounos started working at 13, first as a dishwasher and then working his way through every position in the restaurant. During (and then after) college, he worked at other prominent restaurants throughout Chicago, before owning a piece of the family business, including the 5 O'Clock Steakhouse, a Milwaukee mainstay.

What the professional trajectory does not reveal is the emotional baggage Kalkounos carried. Beginning early in childhood and continuing through adolescence, he was subjected to various incidents of sexual abuse. No one was ever held accountable. And no one ever helped him name what had happened or understand its effect on him.[1] The clinical literature on childhood sexual victimization documents the precise pattern that followed in Kalkounos's life: boundary distortions, compulsive sexual behavior as a maladaptive coping mechanism, the conflation of sex with comfort and control, and the progressive escalation of those behaviors under stress. The attached psychosexual evaluation documents each of these findings and how they were reflected in his life.[2] That is not an excuse for his criminal actions, but a reflection of what has driven Kalkounos and his thinking, including his criminal conduct in 2006.

### A. The criminal thinking and sexual maladaptive behaviors in 2006.

The PSR gives a thorough account of Kalkounos and his crime. There is, to be sure, clear deviant thinking. A person does not become willing to meet a minor without such distorted thinking. But that conduct is also indicative of a person who was out of control in *many* areas of his life. This is reflected in his addictions, including pills, alcohol, work, sex, and gambling.

The Court can see the manifestation of his criminal thinking was both multifaceted and centered on his various addictions. Again, that is not an excuse, but it does provide context for the criminal conduct. For that conduct Kalkounos received an appropriate sentence. In prison, away from his addictions and triggers, Kalkounos did a great deal to tackle his demons. He helped people, he took classes, he taught classes, and he started addressing the root problems.

But the true measure of his desire to change came not from his prison record but from what he did after his release. Within days he attended Alcoholics Anonymous ("AA") and immediately got a sponsor, without a court order requiring him to do so. On

---

[1] Kalkounos_049–051, 063.

[2] Kalkounos_042–074.

May 11, 2010, Kalkounos took his sobriety date. From that point on, AA became the cornerstone of his life, and he attended meetings every day, and later, with the passage of time, two or three times a week for the next 12 years. This is clear and consistent evidence of his commitment to sobriety. His sponsor's letter and those closest to him speak to that fact.

**Dan Hora:** (AA Sponsor for 12 years)

> "Stelio is a good, albeit flawed, person. He spent a long time (12 years) working very hard in the A.A. program and made tremendous progress. Somewhere along the line, he let up on his program and allowed himself to enter into some very bad situations."

**Choua Xiong:** (office administrator at 5 O'Clock Steakhouse for 8 years)

> "Every Thursday morning, he would go to his AA meetings. I see him come and go when I arrive at work. Some of the employees that he has here have also been through AA. Time after time when they mess up, Stelio will be there for them and give them chances."

**Magda Cardona:** (close friend of 10+ years)

> "Stelio's commitment to his sobriety is quiet but constant. I remember a brunch of ours that ran late; he excused himself and stepped away for about thirty minutes to make his call with his sobriety sponsor. He did not skip it or cut it short – the meal waited, because that call came first."

In addition to embracing the benefits of AA and sobriety, Kalkounos addressed the deeper, underlying problems by attending extensive therapy. Kalkounos did not merely meet the requirements of his supervision; he let AA and service to others define his life and transformation.

Largely, that reflects the influence of Dan Hora (who has maintained his own sobriety for over 30 years), and the example he set and the mentorship he gave. Hora walked Kalkounos through every step of the program, not as a religious exercise but as a systematic reckoning with every corner of his life. Recently, Kalkounos successfully reconnected with Hora and began working with him again.

Kalkounos also engaged in court-ordered sex-offender treatment at Pathways Counseling in Brookfield with therapist Brandie Tetzlaff, completing individual therapy, group therapy, Eye Movement Desensitization and Reprocessing ("EMDR") trauma-processing work, and Sex Addicts Anonymous programming. Kalkounos was not passive in treatment.

The Eastern District of Wisconsin recognized his progress. In March 2018—before the end of his full supervision term—the court terminated his supervision early. In 2020,

a federal court granted early removal from the sex-offender registry. In 2021, a Wisconsin court did the same, and Kalkounos was released from the registry. As this Court knows, granting early removal from the federal sex-offender registry is uncommon. Yet two independent courts examined the record and found that Kalkounos was rehabilitated.

During those same years, Kalkounos rebuilt the 5 O'Clock Steakhouse from a struggling business into one of Milwaukee's most recognized independent restaurants. He ran monthly charitable fundraising events through the restaurant—raising more than $200,000 for organizations including Dry Hootch, the Center for Independence, Milwaukee Homeless Veterans Initiative, and families with children who have special needs. And during the pandemic, when the restaurant was required to shut down, he worked weekly to provide meal kits for his 40 employees. This care went beyond his employees and into other areas of the community.

This is not the record of a man who simply complied with supervision. This is the record of a man who rebuilt, contributed, served, and by every external measure became the person the first sentence was designed to produce. Two questions follow: What happened? Why are we here?

**B. The collapse of Kalkounos' accountability structure.**

Given Kalkounos' familiarity with introspection and therapy, the past two years in custody have given him the time to use the tools he has developed to examine what led to these charges. The re-offense did not arise without warning. It followed the slow dismantling of every accountability structure that had sustained Kalkounos for over a decade. None of this is meant as an excuse but as an accurate reflection of how he strayed.

When COVID ended in-person AA meetings, Kalkounos struggled. The infrastructure he once relied on—the physical community of recovery, the frequent accountability of sitting in a room with other people—evaporated. Virtual meetings were a poor substitute, and they made it easier not to attend and not to be held accountable. While Kalkounos stayed in touch with some people, the cohesion he depended on dissolved.

In the years that followed, the losses and the hardships that Kalkounos was not prepared to confront accumulated. Kalkounos' father's cancer returned in 2023, and a series of other problems eroded his personal stability. Most importantly, he started isolating and stopped calling Dan Hora, which eventually led to Hora ending the sponsorship to force him to find another sponsor and resume his recovery. Kalkounos then stopped going to meetings. He stopped praying. He stopped being actively involved in his personal service work. He began withdrawing from every means that had held him accountable.

In that vacuum, the addiction patterns Kalkounos once held in check resurged. He returned to the behaviors that had always served as maladaptive coping for loss and isolation. He was not drunk, and he was not on drugs—his sobriety from alcohol and controlled substances remained intact. But the addictive traits manifested in other ways. First, Kalkounos began working excessively, and work became his addiction. Overworking meant late nights at work, which made it easy to fall back into unhealthy late-night compulsive eating. As those nights accumulated, so too did his excessive weight gain and deteriorating health. Relevant here, Kalkounos also dealt with the sexual compulsion that had never been fully resolved (only managed), and the gambling addiction that had run through his family for generations. These behaviors—all legal—consumed the space that recovery had once filled. The offense underlying this case occurred within that window.

Again, we are not offering this account of his circumstances as an excuse. He is offering no excuses. He knows what he did. He knows who was harmed. He knows that the structural collapse explains the relapse but does not diminish the damage caused. This account gives the Court the full picture of a man whose capacity for genuine transformation is documented and real.

Kalkounos is a man with an addictive personality who threw himself into work, and when things moved beyond his control he slowly fell back into addiction. He rationalized it by telling himself that he was fine because it was not pills or alcohol, which are his true addictions of choice; instead, it was "just" gambling, sex, work, and food. Kalkounos thought no one was being harmed by that. Gambling, he told himself, provided a safe, thrilling, and legal (yet unhealthy) hobby. When it came to his sexual compulsions, all of it was among consenting adults and (in truth) he was also seeing escorts—conduct that was plainly illegal, but not the type of illegal activity calling for prison time.

As to his sexual conduct, Kalkounos had a history of failed romantic relationships. To avoid the emotional toll of a traditional relationship, he gravitated toward "sugar daddy" relationships. The attached expert report describes them. Those relationships offered two things: physical intimacy and immediate flirtation. Right away, Kalkounos felt needed and loved—even if the feeling was artificial.

This phenomenon of a "sugaring relationship" is (as this case has taught the defense) somewhat common. The characteristics of such relationships are described in the following excerpts from the report of human-sexuality expert Dr. Xtine Milrod:

> "A Sugar Baby is one half of a relationship intended to be distinctly and explicitly beneficial for both parties, the other party being a Sugar Daddy (or Sugar Momma, less common). Sugar Babies (usually cisgender heterosexual women) advertise their photos and bios on dedicated websites patronized by Sugar Daddies

> (cisgender heterosexual men with discretionary incomes, who wish to provide emotional and financial support for mutually agreed upon compensation.
>
> Inherent within the sugaring relationships, there is no force or coercion of threats involved to sustain the relationship. Instead, it is one marked by the Sugar Daddy's increasing emotional dependence on the Sugar Baby."[3]

While not a conventional or even socially acceptable form of a relationship, that is the type of relationship that Kalkounos could find and one that worked for him. Whether he settled for it or not, that was the relationship he was looking for when he went on Sweet & Discreet Meet. Kalkounos was not looking for minors. The appendix contains screenshots of the age requirement on the application. The application offers no option to list an age under nineteen. The users depicted on that application appear to be adults.

On that app, Kalkounos talked with many women, and for many of those he gave money and small gifts for the titillation of a conversation and some flirtation. Kalkounos later rationalized his choices to engage even after finding out that one was, in fact, not 19 years old as she represented on the app. That rationalization and then the choice to continue speaking with and then seeing the victim (Minor A, per the PSR) and getting pictures from her is the issue before the Court. And it is what this Court must grapple with when deciding what sentence is appropriate within the agreed 15-to-20-year range. Any sentence within that range is a heavy consequence for getting pornographic pictures from a person he believed was 17. That's especially true because Kalkounos didn't engage in any of the behavior because he was drawn to child pornography or sought to traffic in it. Instead, his desire was for intimacy with women he believed were of age and on the terms of a sugaring relationship, which is not illegal. To be clear, Kalkounos didn't stop once he learned the victim was not within that legal range and that is the criminal activity he will serve at least fifteen years in prison for.

[3] Kalkuonos_081–082.

## II. Present conduct in custody.

Since his arrest, Kalkounos has done what he has always done when he has structure: he has engaged. He has attended weekly AA meetings since intake. He attends Bible study Wednesdays and Saturdays and church service every Sunday. He enrolled immediately in Celebrate Recovery—a Christian-based twelve-step program—and has completed a SMART Recovery course twice and is now taking it for a third time because he finds the lessons valuable. He tutors and mentors other inmates in grammar and resume writing—replicating the same pattern of using his own skills to help others. Two professionals at the jail describe his conduct:

**Pastor Bradley Mueller:** (Pastor at Jefferson County Jail)

> Stelio has been faithfully participating since last August and has not missed a single meeting...Through our extensive time working together over the past year, I have come to know Stelio as a truly wonderful person with a remarkable heart.
>
> Stelio's sincere kindness and his devotion to personal transformation have made a noticeable impact on our group. I have absolute confidence in his character and his continued commitment to a positive, faith-driven path forward."

**John Nasett:** (Minister at Jefferson County Jail)

> "I have known Stelio through our Sunday morning Bible studies for two years...From my contact with Stelio and other inmates who regularly attend our Bible study I deem him to be an honest, respectful and caring person to faith. I have seen many of these same qualities expressed in deeds on a weekly basis."

All of that reflects who Kalkounos truly is and because of that it comes as no surprise that he has received voluminous character letters. Every single one of them is worth a read. Here are some of the quotes the defense believes captures some Kalkounos's most admirable and promising qualities:

**Andy-John Kalkounos:** (younger brother)

> "I believe there is so much good that Stelio can do with the years he has remaining. I know he can continue to be a son to our mother, a brother to me, an uncle, a friend, a talented musician, a productive member of society , and someone who can use what has happened to him to make better decision and perhaps help others avoid making similar ones."

**Debra Leszycski:** (5 O'Clock Steakhouse employee since 2004)

> "his kindness went near and far. I am a widow, on my husband's last day on earth he brought food for the entire hospice center, and fed my family, and the staff there said that no one has ever done that for them there. He has an elegant hard-working family and coworkers who misses him every day. Thank you for considering my letter. We miss him and his compassion and would like to have him back."

**Steve Bollos:** (close friend of 40+ years)

> "perhaps the clearest example of the trust I have in Stelio is my decision to choose him as the godfather of my child."

**Dan Hora:** (AA sponsor for 12 years)

> "Stelio has helped many people, both within his family and without. I remember how well he took care of his grandparents when they were old by visiting them and bringing them food and generally keeping an eye on them. He has done the same with his parents. He has helped them financially, as well, by supporting them when they needed money, especially his dad, mom, and brother. I have watched Stelio help A.A. people, as well."

**Luis Reyes:** (longtime employee at Five O' Clock steakhouse, 12 years)

> "When I had my 3rd child he gifted us many baby supplies like diapers and baby clothes. I always felt like he cared about me and my family. During the holidays he always had something to offer so I could buy my children a gift. Stelio loved to give so much to the people around him without asking for anything in return."

**Rev. Fr. Chris R. Mihalopoulos:** (priest and close friend for 10+ years)

> "An example of this is the time I reached out to Stelio about a family who was struggling with housing in the Milwaukee area and he took care of their back rental fees and provided food for them after their husband lost his job."

**Magda Cardona:** (close friend of 10+ years)

> "I was sitting alone in my parked car after EMDR therapy session, my heart racing and my mind not fully present...I called Stelio. He did not hesitate: "Use box breathing. Let's breathe together – inhale, 5, 4, 3, 2, 1 . . . exhale, 5, 4, 3, 2, 1." He breathed with me until I calmed down, and he stayed on the phone until he knew I could safely drive home. That is who Stelio is."

**Carolina Wheeler:** (employee, 6 years)

> "Stelio is the kind of person who quietly gives back without seeking recognition...In all my years working for him, I've known Stelio to show compassion and provide assistance for individuals and families affected by addiction, homelessness, and domestic abuse. Rather than judging people for their struggles, Stelio has consistently offered support, guidance, and hope. He believes people deserve the opportunity to rebuild their lives and has demonstrated that belief through his actions and willingness to help. His extraordinary generosity also extends to other charities and institutions like veterans programs, the humane society/animal shelters, law enforcement, and beyond."

Those points are reflected in *all* of the letters that have come in on his behalf.

### III. The appropriate sentence.

The parties have agreed to a sentencing range of 180 to 240 months. The factors set forth in 18 U.S.C. § 3553(a)—the history and characteristics of the defendant, the need to reflect the seriousness of the offense, the need to afford adequate deterrence, and the need to protect the public—do not mechanically produce a number within that range. They require the Court to weigh the full human record before it.[4]

The seriousness of the offense is not in dispute. Kalkounos has accepted full responsibility. He understands, without qualification, the harm his conduct caused to a minor who deserved protection. The Court will readily account for that seriousness.

We also ask the Court to account for the full record of who Stelio Kalkounos has been. A man who gave generously of what he built. A man who served his first sentence with purpose and emerged from it to live fifteen years of documented sobriety, treatment, community contribution, and genuine accountability. A man who earned two independent judicial findings of rehabilitation. A man who failed catastrophically, but who, the moment he was placed back within a structure, recommitted to exactly the pattern of engagement that defines him at his best.

The mandatory minimum in this case is fifteen years. It is, by any measure, a substantial penalty. We respectfully submit that a sentence at that floor—180 months—accounts fully for the gravity of the offense while giving appropriate weight to a life that contains far more than the worst of it. Fifteen years is not a light sentence. For someone who is fifty-three with serious health conditions, that is essentially a life sentence. But the lowest available sentence is the one that the record of this man's life, taken as a whole, supports—and the one that achieves the goals of justice.

Sincerely,

*/s/Donna A. Rotunno*

Donna A. Rotunno
Joseph A. Bugni

[4] See *Pepper v. United States*, 562 U.S. 476, 491 (2011) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (cleaned up).