To The Honorable Judge Peterson,

I am writing to you because I sought out and engaged in inappropriate sexual relationships with two young women, KV1 and KV2, both of whom were under eighteen. I take full and complete responsibility for that. Nothing in this letter is meant to explain that away. With KV1, I found out she was underage and I told myself a story that made it feel acceptable to continue seeing her. It was not. With KV2, I did not know her true age, but that does not lessen what I did. I still pursued a relationship I had no business pursuing, and I contributed to their harm. In both cases the responsibility is entirely mine.

KV1 and KV2 were young, and they were already carrying pain of their own, pain I later came to understand was not unlike what I carried at their age. Instead of recognizing that and walking away, I stayed, and I added to it. Whatever they were struggling with before they met me, I made it worse. I exposed them to trauma and to consequences they should never have had to face. My unhealthy view of sexuality and relationships negatively affected both of those girls, and because of their age they were more vulnerable than I let myself see. It was only later that I understood how much they were already struggling, and I should have recognized that their pain was similar to my own when I was younger. Instead of recognizing it and walking away from the situation, I stayed. I am ashamed of that, and I do not expect them to forgive me. What I hope is that I can spend the rest of my time making it less true and being the man I know I can be.

I pray for forgiveness from KV1, because even though in my frame of mind she was months away from turning eighteen, that does not excuse it, I justified it in an unhealthy way, and I feel terrible. I had no knowledge of KV2 being under the age of eighteen, but I still exposed her to trauma, and that does not excuse it either. I pray for forgiveness from both of their families, and I hope to make a living amends to them. I pray that my own family will one day be proud of me again. Specifically my mom, my brother, my uncle, and the rest of my family, that they will give me a chance to make them proud again.

I do not explain the life challenges that follow to excuse my illegal and selfish decisions and actions, but to explain what I have processed in the last two years and how I have worked on recognizing the ways I failed. As 15-20 years of my life hangs in balance, I want to take the time to tell you my story, my failures, and my reflection upon those failures. Respectfully, your honor, here is my story.

Life in and of itself has had its difficulties for me. Once I was released in 2010 from custody for my past offense in 2006, I began a journey of sobriety, accountability, and self-worth and growth, which included court ordered and non-court ordered therapies and treatments. I was eager to grow, learn, and challenge myself. I built a strong support network of friends in recovery, and I found an amazing twelve-step sponsor who helped me apply the principles to my daily life. I had a loving and supportive family, friends, accountability tools, and a relapse prevention plan. I started a music group, and I did various types of service work through my communities. One of the greatest privileges I had in service work was to be a sponsor to several others in various twelve-step programs. I even helped start a program for people who had been arrested for these types of crimes and who were also victims of childhood trauma.

Through those years, since the beginning of my sobriety, when I faced life difficulties, I used the proper tools and got through many challenges in a sober and healthy way. Through my dedication to self-growth and transformation, I was able to gain some success in the restaurant business, and through that success I was able to help my family, my employees, my friends, and my community. At this point in my sobriety journey, I knew the truth of what I had. It was "a daily reprieve contingent on the maintenance of my spiritual condition." What that means to someone in the sobriety community is that I used spiritual tools to get through a day, a week, and a month sober, while seeking a stronger and more structured connection to God's world. As a sponsee, I did everything that was suggested of me, not perfectly, but I was accountable and happy.

A big part of my healthy life goals was to get back into music, which I have loved since childhood and had stopped doing years before. Music became a part of my recovery program, a healthy coping and stress management mechanism, and a joy. I started playing guitar when I was very young, and in 2016 I started a band and began writing, collaborating, and performing original music. It took a lot of work and dedication for someone my age to start a band. We started performing locally and regionally at amazing venues, which included Summerfest, Turner Hall in Milwaukee, and the Hard Rock Café in Nashville. I organized a few regional tours for the band, and we had the blessing of being able to open for some legendary artists, such as Foghat, A Flock of Seagulls, Sponge, Enuff Z'Nuff, Scott Stapp from Creed, Madison's own KennyHoopla, and The Beaches from Canada. Through those years I was fortunate to develop many friendships in the music industry, and one of those friendships ended up being with one of my favorite guitarists from the 90s, Peter Distefano, who became a life and music mentor and who has also been sober for over thirty years.

I have tried to be generous in all aspects of my life, and I have always taken pride in giving to others: my family, my employees, my friends, my band, and my community. I lived for others. For example, I started a 401k program for my employees, and I built an incentive and benefit program along with it. We ran customer sales incentive contests where the top winners received trips and stays around the country and locally. The contest winners received three nights and three days anywhere they wanted, all expenses paid, flight and hotel included. That kind of thing is rare in the restaurant industry. I helped my family in times of financial need with as much as they needed and as much as I could offer. Additionally, over the last ten years I have organized and ran charity events and raised over $200,000 dollars for local Milwaukee charities.

Nothing was perfect, but again, I was generally happy, sober, and helping out the people and community I loved. My life was not over because of my prior mistakes, and I had been building a life and a support system I felt confident in. I never anticipated letting addiction creep back into my life. It was like having a tiny umbrella in a severe thunderstorm. Alone, I didn't have all the protection I needed, and when I needed shelter most, I rejected it.

The storm: I was selected to open for Bon Jovi in Milwaukee, but that opportunity was taken away at the last minute by the band's management, and around this same time, in the summer of 2023, I was invited to be a guest judge on the popular TV show Top Chef, which was filming in Wisconsin that year, but I was uninvited a week before because of my prior 2006 felony. The vocalist of my band quit. Another dating relationship failed. My father's cancer returned after being in remission for many years. My beloved dog and closest companion Nyla died from cancer.

I started struggling. I stopped calling my sponsor on time, I stopped attending meetings, I stopped praying, and many of my worst fears became self-fulfilling prophecies. What started as struggling soon turned into spiraling.

Instead of leaning on the structures I built for myself and on my amazing support network, insecurities led to selfish thoughts, and selfish thoughts led to unhealthy actions. I started to think that I alone was the source of my sobriety, my work, and my life success, as opposed to the amazing effort put in by my sobriety team and my personal board of directors, the others in sobriety I trusted, my accountability partners and loved ones. I became more self-reliant, thinking "I got this." I knew what I was doing was wrong and unhealthy, but I justified it, as many addicts do, by lying to myself. That caused more pain for myself and others, which led to the need to medicate that pain in other ways and to rotate through various forms of addiction. My pain avoidance caused more pain.

In most professional addiction groups, addiction is not considered a "moral failing," but rather an unhealthy coping skill that many people learn through past traumas. I agree with most of the modern research showing that the physiological and neurological responses in the brains of addicts who engage in compulsive binge eating, compulsive sexual behavior, and gambling are nearly identical to the brains of people who abuse alcohol and other drugs. The diagnostic criteria in the DSM-5 for process and behavior addictions are very similar to the diagnostics for substance abuse. I learned this through my independent research and addiction counseling. For an addict with anxiety, depression, and untreated but diagnosed ADD, these old behaviors seemed to fit a past pattern of survival-mode coping skills.

Through the years of hard work in the restaurant business, I received many rewards, but one of my many unhealthy coping skills was to overwork compulsively, an addiction I was always able to rationalize by seeing the success of my work. Overworking to avoid the shame and devastation, as I said, contributed to spiraling. I began overeating late at night before bed, hanging out late in bars, and seeking superficial, mutually beneficial relationships that did not hurt my emotions. These behaviors led to more insecurities, compulsive gambling, and more overeating. With every food binge my physical health worsened, I convinced myself I was relieving the self-loathing and pain of failed and verbally abusive relationships. I started to internalize and believe the insults I received such as that I was just fat and disgusting. I told myself at least I was sober from alcohol and drugs, and I had a successful business so I still had something to be proud of.

While I was able to maintain sobriety from alcohol and drugs, I began to medicate with many other addictions: overeating, compulsive/promiscuous sex, gambling, and working 12-14 hours a day, 5 days a week, and still 4-6 hours on each of my 2 days off. I began to fall back into my unhealthy addictions, and I began a pattern of inappropriate, selfish, and hurtful behaviors. On the outside it seemed that everything besides my weight was going great, but on the inside that was not how I felt, and that was not my reality. Instead of picking up the maintenance of my inner spiritual connection, I told myself that material success, unhealthy attention, and superficial experiences would make me "feel better." I hate to say it, but that was one of the lies I actually told myself. In other words, my insecurities about my physical health and appearance, distrust in relationships, and addiction to sex, fueled my mindset and I convinced myself that my financial appeal could

solve it through the type of mutually beneficial/transactional relationships that those dating apps offered.

I eventually became fully relapsed into hypersexual activity. My addictions went deeper than I'd ever like to admit. What started as a few rationalized behaviors, soon led to addictions being in control. Months before my arrest, these addictions led to me rationalizing spending 1/3 of my paycheck every week on gambling and sex. I sought out sexual relationships weekly through dating websites, and that is where I met the two women I write for today. None of this minimizes or justifies the behaviors that led to my current criminal case. I made no time for healthy relationships, self-care, meetings, or therapy, I made little time for music, and I stopped praying and stopped calling my sponsor. With all of those tools abandoned, I thought that engaging in unhealthy relationships with younger women would make me feel better and boost my ego. What followed is why we are here today.

Since being incarcerated, I have taken the time to understand my addiction and my unacceptable behaviors, not to justify them, but to understand myself better. For nearly twenty-eight months I have been doing that work. I have been seeing a mental health counselor weekly, attending SMART Recovery and AA twelve-step recovery. I have completed the SMART Recovery course twice and am currently taking it a third time, because of how much I believe in it and how helpful it has been in understanding my addictive behaviors. I attend weekly church services in the county jail. I have helped GED students work with the grammar portions of the test and build their résumés. I completed an OSHA certification that could help any career in the food industry. I am currently working with a grief counselor to help me process the loss of my father and therapy for coping with my childhood sexual traumas that went poorly addressed.

On a human level, I have broken up fights in this jail, I have tried to be a positive influence and the voice of reason to the people around me, deescalating situations and emotionally supporting other inmates. I have helped cut hair for two of the disabled inmates for the past few months. I was not asked to do it and I am not looking for recognition. I expect nothing in return, only to offer unconditional respect and help. I am learning that you cannot buy relationships, and that lesson looks different in here than it did on the outside. I am growing closer and closer to my faith through Bible studies and group, which have been led by volunteers in the community. I am most grateful that I have developed a stronger connection to the Holy Spirit and to my spiritual walk while being in this jail. I have even re-engaged with my previous sponsor, who fired me during my relapse. I am eager to learn and grow and to become a man who is not controlled by his addictions.

I still have work to do, and I know it. I need to keep working on my blind spots. I need to continue working on respecting women and not objectifying them sexually or transactionally, and on understanding the importance of healthy intimacy and how successful relationships work. I can never assume that everything is "okay." I need a team. I need accountability partners, friends who know me and are honest with me and hold me accountable for all of my behaviors. The most important thing I believe any of us can do is to have a positive and long-lasting impact on others, and I am committed to staying true to that and to myself.

As you can imagine, your honor, being arrested for these charges at 51, and being separated from my friends, my family, and my life, has been excruciatingly painful, especially with the return of

my dad's cancer that worsened while I've been in custody. I was not able to be there as he suffered and eventually passed away. Missing his final days will forever haunt me. Losing my father while incarcerated, and not being able to grieve with or support my family, has been the most painful part of the last few years for me. My selfish actions added stress and anxiety to my father and mother at the worst possible time, and I do not know how long it will take, if ever, to forgive myself for this. In the last several years my father worked hard to make up for lost time with his family, because when we were young he was a workaholic and struggled with compulsive behaviors himself, such as gambling and work. He was essentially absent from my childhood because of his addiction to work. No father is perfect, but I can genuinely say that in the last several years he became not just a loving father to me, but a friend, a mentor, and my most trusted advisor. He made many sacrifices for our family. He grew up a poor farmer in Greece and many times went hungry as a child, and he did not want the same for us. On the last day I got to spend with him, my family and I prayed together and broke bread together, and our parish priest was there to pray over us. I will always be grateful to you, your honor, for the compassion you showed in granting my furlough, which made it possible for me to begin the healing process and start making my amends to my family before my father passed.

My time at the county jail has not been easy. I didn't expect it to be. As you know, I lost my lead attorney six weeks before trial in 2025, and I had to utilize every resource I could to help defend myself. I thank God for the gracious furlough you granted me to spend a day with my family, which was the greatest day I have had in over two years. In over 800 days, apart from that furlough and trips back and forth to court and to medical appointments, I have not seen the sun or direct sunlight, breathed fresh air, or had any type of healthy outdoor recreation, or any recreation at all, and I have had no regular in-person visits because the jail does not allow for it. While I've had meaningful time to mourn, reflect, repent, and understand my addictions and failures, as you can imagine, your honor, my mental health is still deeply affected by these conditions, and it has also caused me to develop additional medical issues, which are noted in the PSR but now include vitamin D deficiency, bone and joint pain and mild disfiguration, neuropathy from the lack of physical exercise and outdoor recreation, and around sixteen new lipomas that I am still waiting on testing results for. Typically, pretrial and presentence time would not be this difficult or this long, but now, like I said, it has been over 800 days. I ask that you please consider all of this when making your final decision.

I understand that my plea agreement carries a range of 15 to 20 years, and I understand the gravity of what I did. I am not asking you to overlook it. What I am asking is that, in whatever sentence you find just, you leave room for me to do the work I believe I was put here to do, which is repairing harm rather than only serving time.

I have come to believe deeply in restorative justice. I am sure your honor is familiar with these programs. Before my arrest, I worked with charities and organizations in the Milwaukee community committed to exactly that. Since my arrest, I've had time to research and understand its impact more. I am not sure how common it is in the federal system, but I have read research from many credible institutions, locally and nationally, showing that restorative justice can be a way to help everyone heal and to make people whole again. In a mutually agreed and safe environment, one that requires active listening and protects the people involved, it allows victims to openly, honestly, and directly address the pain and the harms and the effects on their lives, and

it allows the person who caused that harm to develop real and direct empathy and to make amends for the specific hurts caused. Again, all of this would be in a safe environment guided by trained professionals. If there is ever a path for me to make direct amends to those I have hurt, in a setting they agree to and that protects them, I want to take it. I will accept whatever conditions you set, and I trust the Court and my attorney to weigh how that fits into the sentence.

With that in mind, and with the conditions you see fit, I would humbly ask whether there may be a way to split up my sentence, such as half in custody and the remainder in community confinement, with your recommendation to the Bureau of Prisons. There are already great programs in Wisconsin, and one in Milwaukee that does individual and group therapy with the person who caused harm and the person who was harmed. During the community portion, I could engage in these types of programs under strict supervision, or help develop one, while also continuing my own therapy and helping to support my family, specifically by being a caretaker to my mother as her health has declined, and now that my father has passed, help my brother as he tries to save four family restaurants from shutting down and more than 200 employees jobs from disappearing. I raise the businesses and the employees only so that you know what I hope to return to and continue providing for, not as a reason to lessen what I owe. I don't want to see more suffer for what I've done.

"If anyone has caused grief, he has not so much grieved me as he has grieved all of you to some extent" (2 Corinthians 2:5). I am deeply sorry to KV1 and KV2 for projecting my past trauma onto them. I am extremely remorseful I also see the pain caused to my family, employees, friends, and community.

I believe an approach like this would do more to serve the purposes of sentencing than, letting my die in prison. I know that sounds harsh, but I have to be honest with myself and your honor. I don't think my physical health will outlast 15-20 years in the prison system. That too is my own fault, I didn't take care of my physical health and I'm facing the consequences. I have watched men leave this jail and come right back, trying to make up for lost time and overwhelming themselves until they fail. I do not want to be that. I want to leave prepared to stay out and to be useful. I have had no previous violations of supervision or of my conditions of supervision. I respected and honored the conditions of my furlough, and I assure you that whatever conditions you place on me in the future, I will follow and abide by them.

I want to thank the volunteers who come into the jails in this area and helped facilitate God's presence in these mentally and physically dark places, and I want to thank the staff members who have acted professionally and humanely to me over the last few years. Keeping the examples of those volunteers in mind, some of whom were previously incarcerated themselves and offer a powerful example of helping others in a meaningful way, I hope that I can be a reliable, helpful, and faithful servant to God, and once again be of service to others, and possibly assist and inspire others on their spiritual and life journeys. Specifically, I hope to help others struggling with similar addictions and to keep them from relapsing and reoffending. Regardless of where I am, your honor, I assure you I will do the best I can to be that example.

Every day now, on top of everything else, I say my prayers, which include asking the Lord to direct my heart, my thoughts, my words, and my actions to align with His. I pray for your mercy, your

honor, and I humbly beg for it. I believe in my potential to help others heal and grow as I heal and grow, and I will not give up on myself. Thank you for taking the time to read this letter.

Respectfully,

Stelio Kalkounos

The Honorable Judge James Peterson
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Re: Stelio Kalkounos

Dear Judge Peterson,

My name is Andy-John G. Kalkounos, and I am Stelio Kalkounos's younger brother. I have known Stelio for my entire life. We grew up together, worked together, built businesses together, lost our father together, cared for our mother together, and have shared the responsibilities and complications that come with being brothers and members of a very close family.

I have struggled with how to write this letter because I do not want to minimize the seriousness of why Stelio is before the Court. I also do not want the worst decisions of his life to become the complete definition of the man I have known for more than fifty years.

Stelio and I were raised by Greek immigrant parents who came to this country believing deeply in work, family, faith, sacrifice and responsibility. Our parents did not have an easy road. They worked extraordinarily hard to build a life and businesses for our family, and Stelio and I grew up inside those businesses. Work was never something separate from family life. It was our family life.

As the older brother, Stelio carried responsibilities before I did. We have spent much of our adult lives working alongside one another, sometimes agreeing, sometimes arguing as brothers do, but always knowing that when something happened to our parents, our family, our employees or our businesses, we were going to face it together.

That is the Stelio I have known.

He can be complicated. He has made mistakes. I am not writing to portray my brother as a perfect man, because he is not, and neither am I. What has been particularly difficult for me throughout this case is reconciling the conduct that brought him before this Court with the brother I have known throughout my life.

I have spent considerable time thinking about how Stelio arrived at this point. Looking back, I believe there were decisions and patterns that developed over time that he failed to recognize or confront when he should have. Whatever explanations exist for those decisions, they do not erase his responsibility for them. Stelio knows that. Our family knows that.

But I also know those decisions are not the entirety of his character.

I have watched this case change my brother.

He has spent more than two years in custody in a county jail with literally no sunlight or fresh air. During that time, he has lost his freedom, his livelihood, the reputation he spent a lifetime building and something that cannot simply be restored when a sentence ends, time with his family.

Our father died while Stelio was in custody. Our mother has suffered two strokes. These events have forced our family to confront mortality, responsibility and the consequences of lost time in a way I never expected.

Since our father's death, I have also inherited the debts and obligations he left behind, while assuming essentially the entire operational burden of managing our four family small businesses on my own. These businesses are struggling, each carrying its own financial obligations, employees and families who depend upon them. Responsibilities that Stelio, my father and I once shared have increasingly fallen to me alone.

At the same time, I have significant responsibilities outside our family businesses. I serve in an elected public capacity representing and helping support a community of approximately 115,000 residents in Palatine Township. I take that responsibility very seriously, and it is another substantial obligation that I must continue to fulfill regardless of the difficulties facing my own family.

I accept all of these responsibilities because they are mine to carry, but I would be less than truthful if I did not tell the Court that the combined weight of losing my father, caring for our mother, supporting my own family, managing these businesses and their substantial financial obligations, fulfilling my responsibilities in public service, and doing all of this without my brother has been enormous.

Stelio's continued absence affects more than him. It has left a very real void in the family and businesses that depended upon both of us. I am doing everything I can to hold all of this together, but I cannot pretend that I do not need my brother. If he were allowed more time in community custody or another form of Court-approved supervision that would permit him to assist me as we address and wind down these business obligations, I could not be more grateful to the Court.

One of the hardest things for me has been watching major events happen within our family while my brother could not be there. Whatever he is in trouble for, he is still my brother. There are moments involving our parents and our family that can never be recreated.

I also worry about Stelio's physical health. He is severely diabetic and requires consistent medical attention. I understand that incarceration necessarily involves hardship, and I am not presenting his health as an excuse for his conduct. I mention it because I love my brother, I have watched his health deteriorate, and I genuinely worry about what an extended period of incarceration will mean for him physically, not to mention our fragile mother and my family at home.

I know Stelio has been humbled by what has happened. I know he understands today, in a way that perhaps he did not before, how individual decisions can affect an entire family, employees, businesses, friends and a community.

If Stelio is permitted to return home, he will not return to an environment without structure or accountability. Our family will be here. I will be here without fail.

My support for him does not mean telling him that everything he did was acceptable. It means expecting more from him. It means helping him rebuild his life lawfully and responsibly. It means making certain that the lessons of these years are not forgotten once the immediate pain of this case begins to fade.

He will have a place to live, family around him, and a path toward productive and lawful work. More importantly, he will have people around him who love him enough to hold him accountable.

Judge Peterson, I understand that you have responsibilities that extend well beyond the feelings of Stelio's family. I respect that. I am simply asking that when you determine the appropriate sentence, you consider the whole person standing before you.

My brother has done wrong. He must live with that.

But he is not a bad or irredeemable man.

I believe there is so much good that Stelio can do with the years he has remaining. I know he can continue to be a son to our mother, a brother to me, an uncle, a friend, a talented musician, a productive member of society, and someone who can use what has happened to him to make better decisions and perhaps help others avoid making similar ones.

I have known Stelio longer than almost anyone who will write to you. I know his strengths and his weaknesses. I know things about him that make me proud, and I now know things that have disappointed me. After everything that has happened, I still believe in my Stelio and I know he can bounce back in a positive manner.

I respectfully ask the Court to give meaningful consideration to the punishment Stelio has already endured, his health, his acceptance of responsibility, his family circumstances, the entire loss of his business and the life that he still has the opportunity to live.

Thank you for taking the time to consider my perspective and for considering Stelio as the complete person I have known throughout my life.

Respectfully,

Andy-John G. Kalkounos

Daniel M. Hora
391 Sandhurst Circle, Unit 7
Glen Ellyn, IL 60137
(847) 257-6213
dan_hora@yahoo.com

06/22/26

The Honorable Judge James Peterson
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Re: Character Letter for Stelio Kalkounos

Dear Judge Peterson,

My name is Dan Hora, and I am Stelio's A.A. sponsor. I sponsored Stelio for 12 years (from 2010 until 2022) when he first got sober. Then we went our separate ways for about 3 years and now I am sponsoring him again as of the last 3 months or so. I believe that I know Stelio as well as anyone, even his family, and would like to provide a character reference for Stelio Kalkounos and to respectfully ask the Court to consider the following when determining an appropriate sentence.

Stelio is a good, albeit flawed, person. He spent a long time (12 years) working very hard in the A.A. program and made tremendous progress. Somewhere along the line, he let up on his program and allowed himself to enter into some very bad situations. It seems to me that Stelio is now as interested as he ever was and reached out to me to begin again our work together.

Stelio has helped many people, both within his family and without. I remember how well he took care of his grandparents when they were old by visiting them and bringing them food and generally keeping an eye on them. He has done the same with his parents. It is natural for Stelio to help people and especially his family. He has helped them financially, as well, by supporting them when they needed money, especially his dad, mom, and brother. I have watched Stelio help A.A. people, as well. Stelio is very generous with his time and his money. I believe that this is automatic for him.

Stelio has sponsored men in the program and he helped them and taught them the program. Stelio has hired A.A. people at his restaurant, sometimes to his detriment,

but always handled whatever happened well and always considered how he could help even those that didn't work out too well.

Stelio has organized many fundraising events over a long period of time. Examples: National Thank a Police Officer Day, veterans' benefits, Hunger Taskforce, East Side Alano Club, Broadscope Disability Services, Street Angels, Milwaukee Center for Independence, etc.

The main thing about Stelio, for me, is that he is alcoholic and spent a long time working proactively to recover, and, at some point, he fell away from the program and really went downhill and is horribly surprised and dismayed by what happened. I think that he has other issues too and should get counseling for those issues outside of A.A., which he is doing.

These days, Stelio sounds to me to be the same person he was 3 - 4 years ago when we lost touch, although he sounds much more desperate to work the program and has a robust routine, as far as reading and praying and trying to help those around him, and this will help him.

I believe that Stelio will make a "2nd" recovery and that he will become a man who will help many people both in prison and out of prison. Of course, it is up to him, but he has many people in his life who are pulling for him and want him to once again be the good man that he was, and that includes me. I believe that this experience will make him even better than he was before, but that will depend on his continuation of the program. I suspect that he will not let what happened in the last 3 - 4 years ever happen again.

I respectfully ask the court to consider who Stelio really is and not who he became after letting up on his program. Stelio has every possibility to become that person again and has incredible support from those who love him. I will do anything that I can to help Stelio and I see him going down a great path today.

Thank you for your time and consideration of this letter.

Sincerely,

Daniel M. Hora

(sober since 05/27/90)

August 7, 2026

Dear Judge Peterson,

My real name is Magdalini Kalkounos. Our family moved to America in 1966 for economic reasons. The day after arriving I went to summer school to learn English! I am the first to finish and get diploma from high school, first to get driver's license in my family.

At 19 years old I ended up married to George. He was 22. By 23 we had Stelio, born in Fond du Lac. George had his own restaurant on Main Street which he had to file bankruptcy because the big malls were starting outside of city. He send me to Greece to have his family meet our baby Stelio. When I came back he had our belongings and furniture move to Chicago, close to O'Hare airport. George and I worked extremely hard. We had ups and downs, between the arguments, but loved our two sons, and survived 56 years of marriage. We reached the American dream with no education but love for our family, hard work, and many customers we adopted as extended family members. Our boys worked hard alongside us since they were 14 years old.

The Irish waitresses started calling me Maggie, so most people know me as that name.

Your Honor, I need to extend my heartfelt “BIG THANK YOU”!!! When George was at his last days on this beautiful Earth, your kindness and generous heart allowed us to have the warmth, love that we only have from family. All of us treasure the pictures we took for last time with George. Your action to allow Stelio for that visit will and could never be forgotten! Thank you so very much from all of us!!!

To our Stelio you were “GOD SEND.” Being deeply hurt, embarrassed, devastated, depressed for his big mistake, humiliated him and all of us that truly care and love him! Not only our family but friends and customers, also his co-workers!!! Stelio felt mortified with no hope! Trying hard not to cry in jail in front of others, in his humble, reserved character that always holds feelings in his heart.

Our whole family has endured tremendous loss. Most difficult heartbreak to deal with is Stelio! All of us are trying to survive. Andy-John working with no sleep to run four restaurants because I had a couple of strokes and can't drive far alone. When it rains it pours as usual. Economics not doing good either!

Stelio is learning extremely hard lessons on how his own mistakes with words and actions do not hurt only him but every person who cares and truly loves him. Even customers. For example, at George's funeral there were ±1,750 people!

Stelio is devastated by realizing deeply the hurt he created. But he knows and pleaded with the law! He is not healthy, has lost some weight, but needs to handle lots with his health, emotions, feelings, regrets, missing us all!

The only good thing is he has gotten a lot closer to our faith, to God. I told him sometimes God helps us in mysterious ways! What I mean, his weight issues were out of control and I was afraid for heart attack!!

His self-esteem is suffering because if you know him, his true character does not correspond with the nature of offense.

I am not trying to excuse his mistake, but everyone who knows Stelio knows he is honest, kind, thoughtful, generous with mind and spirit, overly trusting nature to extreme! When I try to correct in mom's way he tells me “mom take a moment to breath! Be kind!”

When both Stelio and Andy-John were young, Andy-John would try hitting Stelio, and in a calm manner Stelio would remind AJ to stop because “I love you and you're my brother, I don't want to hurt you because I am bigger than you!”

He is still easy going, reserved, honest, not aggressive, has his awesome music talent to deal with life's issues! Heals his heart by donations to too many causes to mention!! Since teenager, not only now!

Stelio has the support of friends: from school friends, neighborhood friends, co-workers, many customers, our church priest and most importantly our whole family and relatives, cousins, aunts, uncles, music community in Chicago and Milwaukee.

Your Honor, I am very sorry for this long letter. I understand your difficult position!

So respectfully I ask of you to consider not just the offense but also the true character of Stelio! He has many positive, compassionate qualities other than his offense.

I believe with your thoughtful legal consideration and guidance, along with me and our families' support, we can give him a chance he truly deserves! I promise you, as long as I am alive I will love and support, but also expect responsibility, gratitude, with no more mistakes nor guilt by his own doing, by his over-trusting nature.

I respectfully ask the court to consider leniency by imposing a sentence that could allow Stelio the opportunity to continue his rehabilitation closer to me if possible. I am older now with health issues and with two strokes I cannot drive alone far distance by myself, at night. My other son has 4 places, his other job and a family, so it's extremely difficult circumstances or I would not ask. My daughter in law is a teacher working also.

Thank you very much for your time, consideration and your service at this crucial time! I will be forever grateful for your consideration.

Respectfully,

Magdalini (Maggie) Kalkounos

Magda Cardona
125 N. Buffalo Grove Rd., #203
Buffalo Grove, IL 60089
(847) 275-9970
Magdaec7@gmail.com

July 18, 2026

The Honorable Judge James Peterson
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Re: Character Letter for Stelio Kalkounos

Dear Judge Peterson,

Stelio Kalkounos has been one of my closest friends for nearly ten years - a friendship that has also included working alongside him on professional projects, community events, and his band's performances. I am writing to respectfully ask the Court to consider who Stelio is to the people who know him when determining an appropriate sentence.

Stelio leads with humble dedication in everything he does for his family, his work, his community, and his friends. He is the person you can count on for an honest opinion, for real help, or for a plan when a team needs to pull together and get something done.

I know this firsthand. I am a PTSD survivor. One afternoon, I was sitting alone in my parked car after an EMDR therapy session, my heart racing and my mind not fully present, and my therapist had already left the building. I called Stelio. He did not hesitate: "Use box breathing. Let's breathe together - inhale, 5, 4, 3, 2, 1… exhale, 5, 4, 3, 2, 1." He breathed with me until I calmed down, and he stayed on the phone until he knew I could safely drive home. That is who Stelio is. When someone he cares about is struggling, he shows up completely.

I have also worked under Stelio's lead, on a project for hotels and on performance days for his band, where I sold merchandise from the booth he organized. On the hotel project, he explained the entire job to me in detail and walked me through every question or confusion over the phone, whenever I needed him - and we improved the project together before passing it along to the rest of the team. He plans carefully, communicates clearly, and takes responsibility for the outcome. I have watched him teach himself piano so he could put music to his own lyrics. When life brings Stelio a challenge, he works at it until he gets through it - and then he helps the people around him do the same.

Most recently, Stelio asked me to help represent his family's restaurant at the 10th-anniversary celebration honoring Near West Side Partners, a nonprofit working to revitalize Milwaukee's Near West Side. I helped set up, handed out food while following food-safety guidelines, and helped spread awareness of the organization's work in the neighborhood. Even with so much

weighing on his own life, his attention was on making sure everything ran smoothly and on the overall mission of the night - giving back to the community his family's business calls home.

Stelio's commitment to his sobriety is quiet but constant. I remember a brunch of ours that ran late; he excused himself and stepped away for about thirty minutes to make his call with his sobriety sponsor. He did not skip it or cut it short - the meal waited, because that call came first. I have also watched him give friends struggling with their own sobriety a second chance whenever he could, asking for their help on community projects or at the restaurant. He never treated it as charity. He gave them a role and a reason to show up, because he understands what purpose and dignity mean to someone rebuilding their life.

Over the past year, I have watched Stelio grow spiritually. No matter how hard things have been for him and his family, he thanks God in our many phone calls and finds much to be grateful for daily. I saw this most clearly when his father passed away. I attended the funeral in person, and I helped Stelio be present online so he would not have to say goodbye alone. What I witnessed was a son leaning on his faith - focused not on himself, but on honoring his father and comforting his family. As difficult as it was, he carried that loss with grace, and he has come out of it more grounded in his faith than I have ever seen him.

Over and over again, I have watched Stelio get back up and come back stronger - emotionally, spiritually, and psychologically.

I humbly defer to the Court's judgment. I can only speak to the man I have known for ten years: someone who has built his life around helping others and who shows up for his community and loved ones, year after year. Whatever the Court decides, I am committed to supporting Stelio when he returns - and to holding him accountable, with honest expectations for his future, because I believe in the man he is still becoming. I trust he will honor whatever chance he is given.

Thank you, Judge Peterson, for taking the time to read my letter and to see Stelio Kalkounos through the eyes of someone who knows him well.

Sincerely,

Magda Cardona

**Gregory P. Vazquez**

396 Uvedale Road

Riverside, IL 60546

773-914-5052

gpaulvazquez@aol.com

August 12, 2026

The Honorable James D. Peterson

United States District Judge

United States District Court for the Western District of Wisconsin

120 North Henry Street, Room 320

Madison, WI 53703

**Re: United States v. Stelio Kalkounos, Case No. [Case Number]**

Dear Judge Peterson,

I am writing this letter to respectfully offer my personal perspective on the character of Stelio Kalkounos, who is currently before your court for sentencing. I have known Stelio since 2007, when I began playing guitar in a jazz group at the restaurant managed by Stelio and owned by his father.

Over the nearly two decades that I have known him, I have had a unique opportunity to observe Stelio's work ethic, his responsibility, and his deep devotion to his family. While running the day-to-day operations of his family's restaurant, Stelio proved to be an exceptionally reliable, organized, and dedicated manager. He approached his work and the musical side of the venue with a pure, uncorrupted enthusiasm and an approachable nature that brought genuine joy to the staff, patrons, and musicians alike. He took a strong interest in our music and placed immense trust in me by putting me in charge of booking all the musical acts for the venue.

Beyond our professional relationship, Stelio and his family became close and thoughtful friends to my family. My son occasionally played bass in our jazz trio, and Stelio formed a meaningful bond with him as well. I will always remember Stelio's generosity when he drove forty minutes out to our home just to pick up my son and me, treat us to a Chicago White Sox game with excellent seats, and cover all the expenses for the day. This act of kindness reflects the attentive, supportive, and giving nature I have consistently seen in him over the past 19 years.

The hospitality and compassion Stelio possesses are a direct reflection of the tight-knit, generous family environment in which he was raised. Even after my own work schedule conflicts prevented me from playing at the restaurant regularly, I would occasionally visit. I recall the last time I was there, I was dining alone, and Stelio's mother and father sat with me to keep me company, welcoming me like family and refusing to accept payment for the meal.

I also witnessed firsthand the profound, loving relationship Stelio shared with his father. On one occasion, I invited Stelio to sit in and play music with our trio. While he was playing, his father walked into the restaurant and gave Stelio a long, incredibly tender hug. It was an authentic moment of mutual pride and affection that stayed with me for years. Tragically, Stelio's father passed away just about a month ago while Stelio has been in federal custody awaiting sentencing. This loss has been devastating for him, compounded heavily by the isolation of his current confinement.

I am aware of the very serious nature of the federal charges Stelio is facing. I do not minimize or excuse this offense. However, I know that he is a man capable of deep love, immense responsibility, and profound grief. I believe that the weight of his actions, combined with the tragic loss of his father during this period of incarceration, has profoundly impacted him. I respectfully ask the court to consider his capacity for rehabilitation, his history as a dedicated son and worker, and the tragic circumstances of his recent family loss when determining his sentence.

Thank you for your time, your consideration, and your service to the court.

Respectfully submitted,

Gregory P. Vazquez

---

Dear Honorable Judge Peterson,

My name is Tom Mourafetis. I'm also often referred to as Uncle Tommy by family friends and colleagues at our family's businesses. The reason for that moniker is that I'm Stelio and his brother Andy-John's uncle by relation (their mother's baby brother by 20 years) although we've grown up together more like brothers. It's kind of hard for people to understand how close my relationship with Stelio is and growing up from being 1 year older than my oldest nephew Stelio.

Our family's history is huge part of mine and Stelio's life. Our parents came from Greece as immigrants. My father Stelio's grandpa (a World War 2 veteran of the Greek army) and mother came to the United States with 3 young daughters one of which is Stelio's Mom Maggie with the American dream of creating a better life for their children. Years later, my parents had me at a very late age of nearly 49 yrs. and at the same time my older sister Maggie was getting married to Stelio's father George. Sure, enough, I became Uncle Tommy at age 1 to Stelio and our lives have been intertwined since.

Our lives growing up were blessed by a loving and supportive family of super hard-working completely selfless parents that showed us by example what selflessness means. As an example as a child my bicycle was stolen, and my father had recently lost his job. He was bewildered as to how to get his little boy a replacement bicycle with no money or job and what he thought echoed in our family's heads. Out of complete desperation to apprise his son my father thought of taking me with him to a dentist to remove his gold caps on his teeth then to a pawn shop to sell that gold and then directly to a bicycle shop to buy me a bicycle. I can’t tell you how your Honor, but that same spirit of selflessness lives on in our family and is the most prominent characteristic of my father’s first grandson Stelio!

You see your Honor growing up Stelio was always that way, kind thoughtful and giving. As children and into our young man year's he was absolutely the most loved of all our childhood friends. Always was the first person our friends would ask about when they hadn't seen or heard from him. Even our most distant family and friends always asked about Stelio because of the absolute sincerity of his personality. They always felt different when Stelio asked them how they were doing as opposed to just saying it as a process of cordiality. He took true interest in people's lives, and they knew he'd always be there for them as I'm sure you will hear from others, the countless examples of this.

As we got older Stelio's worked so hard on his artistic talents. Music and art were his true love. Many people loved his music, and he built many friendships through the arts. His musical success took him to many venues and exposed him to people that were so talented but didn't have the means to put out their work. That's when his business career allowed him to support many of those people and charitable organizations within his community and beyond. Always relentless in his thoughts of ways to give back. Consistently making a point of helping organizations from the hungry and homeless to

addiction groups and even law enforcement organizations. I can't even remember them, there have been so many.

On a more personal note, Stelio's been there for me in so many instances. One personal example was that he always insisted on our children pursue their artistic ambitions, as he has always pushed the children in our family to follow those passions and pursue them. Always supplying them with gifts of musical instruments during holidays and birthdays. Now all the children in our family are carrying on that flame of love for music and arts in large part because of the lessons and gifts from their uncle Stelio. That is a gift that they'll always have because he made sure to allow them to pursue those interests. I can't even tell you the love our family's kids received from his kindness and generosity!

In summation, your Honor, Stelio is a large part of our lives and although his addictions put him a place we never thought they'd lead. I truly believe he has undeniably redeemable qualities as a person and will be able to reform himself once again. His spirit of selflessness is relentless. In my opinion he truly only hurt his family and most of all himself. As for his family, we will forgive him, but I know it's not up to us to forgive him. Please know that any mercy you see fit as to sentencing will not be wasted. He will have the full support and love of our family in every way imaginable. I promise!

Thank you for your consideration of this letter on Stelio's behalf.

Tom Mourafetis

Mourafetis@gmail.com
Cell: 847-293-8390

Pastor Bradley Mueller

311 Park Street Apt 2

Fort Atkinson WI 53538

920 650-6284

muellerbrad04@gmail.com
06/31/2026

**The Honorable Judge James Peterson**

**U.S. District Court, Western District of Wisconsin**

**120 N. Henry Street, Room 320**

**Madison, WI 53703**

**RE:** Character Letter for Stelio Kalkounos

Dear Judge Perterson,

My name is Bradley Mueller, I am one of the pastors at the Rock River Assembly of God Church in Jefferson. I also am the chaplain at Alden Estates in Jefferson. I serve as a pastor and a minister to Stelio at the Jefferson County Jail, where I have been working closely with Stelio with him through the Celebrate Recovery CRI program. Stelio has been faithfully participating since August and has not missed a single meeting. I am writing to provide a character reference for Stelio Kalkounos and to respectfully ask the Court to consider the following when determining an appropriate sentence.

Through our extensive time working together over the past year, I have come to know Stelio as a truly wonderful person with a remarkable big heart. He possesses a strong, vibrant faith that anchors his daily actions and decisions. Even while navigating his current circumstances, Stelio's focus remains outward; he consistently looks for ways to help others around him and is always genuinely loving toward people. His perfect attendance and steadfast

dedication to his recovery are a direct reflection of his deep faith and his desire to live a life of integrity. Stelio's sincere kindness and his devotion to personal transformation have made a noticeable impact on our group. I have absolute confidence in his character and his continued commitment to a positive, faith-driven path forward.

In addition to our group meetings, I have had the privilege of sitting down for several one-on-one talks with Stelio. Through these personal conversations, I have recognized that he possesses great natural talents, a strong leadership capability, and a remarkable gift for music. I truly believe he has a calling into the ministry, and I can clearly see him serving as both a leader and a worship leader in the church in the future.

I respectfully ask the court to consider Stelio Kalkounos, whom I have had the privilege to work with and watch him develop deep spiritual maturity while helping others do the same. I am committed to supporting him when he returns, and It would be an honor to serve with Stelio in the community and congregation. I am confident he will make the most of whatever opportunity the court gives him.

Thank you for your time and consideration of this letter.

Sincerely,

Pastor Bradley Mueller

Craig Cerniglia
5867 Mackinac Lane
Hoffman Estates, IL 60192
847-980-7707
craig@comm-2000.com

August 7, 2026

The Honorable Judge James Peterson
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Re: Character Letter for Stelio Kalkounos

Dear Judge Peterson,

My name is Craig Cerniglia, and I have had the privilege of knowing Stelio Kalkounos for almost 35 years. We met in high school and quickly became close friends. We spent a great deal of time together, both in school and outside of it, and I have had the opportunity to watch him grow into the person he is today.

During high school, we had several classes together, and most Friday nights were spent going to football games, hanging out with friends, and talking about what we hoped our futures would look like. Both of our families were involved in the restaurant business, and we shared a dream of one day finding success in that industry. Even after we went our separate ways for a short time during college, we reconnected and continued talking about our goals, our careers, and the future we wanted to build.

Music has always been one of Stelio's greatest passions. He played guitar in several bands, including Brando's Charm and Sacred, and I spent countless hours watching rehearsals, attending shows, and simply hanging out while he played. I remember going to see his bands perform at Navy Pier, throughout the Milwaukee area, and at New Year's Eve celebrations. It was always exciting to watch one of your closest friends perform in front of hundreds of people. His talent was obvious to everyone in the room. To this day, I still consider him one of the most gifted guitar players I have ever known, and certainly the best musician among our group of friends. Watching him perform and seeing the joy that music brings to him and the people around him are memories I will always treasure.

As we both began working in our family restaurant businesses, our conversations shifted from dreams about the future to the day-to-day challenges of running a business. Even though I eventually chose a different career path, Stelio has always been someone I look up to and learn from. He has never acted like he has all the answers. Instead, he is always willing to share his experiences, offer advice, and encourage others. Some of the best lessons I learned came simply from watching how he treats people.

Whenever my family or I visit one of the restaurants he manages, he always makes us feel incredibly welcome. He personally makes sure everything is perfect and that we receive exceptional service. He treats us like we are the most important guests in the restaurant. What impresses me most is that he treats everyone that way—not just friends and family, but complete strangers and the people who work alongside him every day. It doesn't matter if you are a customer, a close friend, or a member of his staff. Everyone receives the same respect, appreciation, and genuine kindness. It isn't something he does because someone is watching; it is simply who he is.

Over the years, Stelio has become more than just a friend to me. He has become someone my entire family knows and loves. My wife and children have experienced firsthand the kindness, generosity, and compassion that define his character. He is someone people naturally turn to because he listens without judgment, genuinely cares, and always wants to help.

One example that has always stayed with me was during the COVID-19 pandemic. While much of the country was shut down and so many people were facing uncertainty, Stelio brought his kitchen staff back into the restaurant to prepare meals for his employees and their families. Each evening, staff members could stop by and pick up boxes of fully prepared meals to take home. He didn't do it because anyone asked him to or because he wanted recognition. He did it because he genuinely cared about the people who worked for him and wanted to make sure they and their families were taken care of during an incredibly difficult time. To me, that perfectly reflects the kind of person Stelio is.

I truly believe Stelio has many positive qualities that will continue to serve him well wherever life takes him. His leadership, work ethic, compassion, and ability to connect with people make him an asset in any environment. Whether working in the restaurant industry, mentoring others, teaching hospitality, or pursuing another path, I know he has the ability to make a positive impact on the people around him.

I respectfully ask that you consider the character of the man I have known for most of my life. While no one is defined by a single chapter in life, I know Stelio as a caring, thoughtful, and genuinely good person. Those qualities have remained constant throughout the 35 years that I have known him, and I have no doubt they will continue to define the person he is moving forward.

Thank you for taking the time to consider my thoughts.

Sincerely,

Craig Cerniglia

Carolina Wheeler
2324 W Wisconsin Ave Apt 52
Milwaukee, WI 53233
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
carolinaw1@sbcglobal.net

The Honorable Judge James Peterson
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Re: Character Letter for Stelio Kalkounos

Dear Judge Peterson,

My name is Carolina, and I'm an employee of Stelio Kalkounos. I'm writing this to provide a character reference for Stelio Kalkounos, who is currently awaiting sentencing. For the last five plus years, I've had the opportunity to work under him, and I wanted to share my experience and personal observations regarding his character and the type of person I have come to know over the years.

Throughout the time I have worked with Stelio, in addition to incredible work ethic and knowledge that people spend years in school to learn, I have seen someone who consistently treats employees fairly and gone out of his way to help staff members when they were facing personal, mental, or financial crises. Whether it was offering flexibility, providing encouragement, being available to listen, or assisting financially, Stelio has shown genuine concern for the people who work alongside him, during hard times.

Beyond his business, I have also witnessed his deep commitment to his family and to our local community, who he also views and treats as family. Stelio is the kind of person who quietly gives back without seeking recognition. I have seen firsthand how important it is to him to support others and make a positive difference.

One quality that has always stood out to me is his generosity. In all my years working for him, I've known Stelio to show compassion and provide assistance for individuals and families affected by addiction, homelessness, and domestic abuse. Rather than judging people for their struggles, Stelio has consistently offered support, guidance, and hope. He believes people deserve the opportunity to rebuild their lives and has demonstrated that belief through his actions and willingness to help. His extraordinary generosity also extends to other charities and institutions

like veterans programs, the humane society/animal shelters, law enforcement, and beyond.

I understand the seriousness of the matter before the Court, and I respect the responsibility you have in determining an appropriate sentence. My purpose in writing is simply to provide an honest review of the person I have come to know. Although our road has been a bit rocky, I believe Stelio is a person of kindness, generosity, and integrity, and his positive influence extends well beyond the workplace.

I respectfully ask the Court to consider these qualities, along with his contributions to his employees, family, and community, when determining an appropriate sentence.

Thank you for your time and consideration

ECUMENICAL PATRIARCHATE · GREEK ORTHODOX ARCHDIOCESE OF AMERICA
METROPOLIS OF CHICAGO

SAINT NECTARIOS GREEK ORTHODOX CHURCH

133 S. Roselle Road, Palatine, IL 60067 · Tel.: (847)358-5170 · Fax: (847) 358-5193 · Web: www.stnectariosgoc.org

Your Honor,

I am writing on behalf Mr. Stelio Kalkounos. Mr. Kalkounos is a parishioner at St. Nectarios Greek Orthodox Church in Palatine, IL from the very beginning of the community 52 years ago. I have known Mr. Kalkounos for 10 years and we have built a very strong spiritual relationship that has shown in his service as he has helped the great community. I have many wonderful experiences that Stelio and I have participated in especially when it involves the community. Stelio has taken initiatives to help the less fortunate and to help feed many people from his days in the Chicagoland area up until his work at Five O'clock Steakhouse in Milwaukee as well. An example of this is the time I reached out Stelio about a family who was struggling with housing in the Milwaukee area and he took care of their back rental fees and provided food for them after their husband lost his job. There are examples where Mr. Kalkounos would exemplify the attitude of Christ-like in service and care for others.

The emotional support that Stelio has been receiving from my self as his priest and his family has been instrumental to the strength, he has been getting during this difficult time in his life. Stelio has always turned to the Greek Orthodox Church for support and he would always support the needs of the many parishes that he supported in the Midwest.

As his priest and friend, I have seen personally in the 10 years I have known a growth that would be defined by as "spiritual maturity". An attitude of appreciation, gratefulness, ad thankfulness that would be expressed by reciprocating the blessings God has bestowed on him to be given to others. Especially to those in need. It humbles me to see how much he has grown even in the midst of the storm.

Your Honor, I appreciate you taking the time out to read my letter.

With appreciation and thankfulness,

Rev. Fr. Chris R. Mihalopoulos- Protopresbyter

Parish Priest of St. Nectarios Greek Orthodox Church Palatine, IL

**Debra Leszczynski**
**4311 S. 86th Street**
**Green Field Wi, 53228**
**Phone: 262-227-3897**
**Email: Debral4311@gmail.com**
**Date 7/16/26**

Dear Judge Peterson,

My name is Debra Leszczynski, I am the hostess at Five O'clock Steakhouse. I have worked here for 23 years, 21 years with the Kalkounos family. Ten of those years and five days a week with Stelio Kalkounos. I am writing to provide a character reference for Stelio and respectfully ask the court to consider the following when determining an appropriate sentence.
Stelio worked tirelessly marketing the restaurant and then greeting guests to make them all feel at home. He gave to charities and had fundraisers like the car shoe to benefit Dry Hootch and the Hunger Task Force. His kindness went near and far. I am a widow, on my husband's last day on earth he brought food for the entire hospice center, and fed my family, and the staff there said that no one has ever done that for them there. He has an elegant hard-working family and coworkers who misses him every day. Thank you for considering my letter. We miss him and his compassion and would like to have him back.

Sincerely
Debra Ann Leszczunski
Debra Leszczynski

Steve Bollos
575 Forest Ave
Chicago, IL 60018
(847) 409-0025
Stevebollos@yahoo.com

July 25, 2026

The Honorable Judge James Peterson
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Dear Judge Peterson,

My name is Steve Bollos, and I have known Stelio Kalkounos since we were approximately 12 years old. Over the years, our friendship has grown through our work, our families, and our church community. Having known Stelio for such a significant portion of my life, I am writing to share with the Court the character of the man I have personally come to know and trust.

Throughout our friendship, I have known Stelio as someone who places tremendous importance on family, faith, friendship, and helping others. He is someone who has worked hard throughout his life and has always maintained strong connections with the people around him. I have seen the importance he places on being there for his family and friends, as well as the loyalty and commitment he shows toward those who depend on him. Over the many years I have known him, I have also seen him mature and grow as a person and become increasingly focused on his responsibilities to his family and community.

Perhaps the clearest example of the trust I have in Stelio is my decision to choose him as the godfather of my child. In our Greek culture and faith, choosing a godparent is not a casual decision or simply an honorary title. It carries a lifelong spiritual and familial responsibility. When my wife and I considered who we wanted to hold such an important place in our child's life, I chose Stelio because I trusted his character and believed he was someone I wanted my child to be able to look to throughout her life. To me, there are few greater demonstrations of the confidence one person can place in another.

I respectfully ask the Court to consider Stelio's character, the positive contributions he has made to others, and the strong network of family, friends, and community that will continue to support him and hold him accountable in the future. I remain committed to being part of that support system. I sincerely believe Stelio has the ability to continue using his life and experiences to positively impact his family, and his godchild.

Thank you for your time and consideration of this letter.

Sincerely,

Steve Bollos

Jason Christopher Blank
389 Roosevelt Street
Fond du Lac, WI 54935
920-948-7214
jasonblank123@gmail.com

07/08/2026
The Honorable Judge James Peterson
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Re: Character Letter for Stelio Kalkounos

Dear Judge Peterson,

My name is Jason Blank and I am writing on behalf of my cousin, Stelio Kalkounos, for your consideration during sentencing.

I understand the seriousness of the offense for which Stelio has been convicted, I do NOT write this letter to excuse or minimize his actions or the impact they have had. I recognize that accountability is necessary and I have respect for the Court's responsibility in this matter.

I am writing to share my personal experiences with Stelio and the character I have known throughout the years.

Stelio has always been one of the hardest working people I know. Through years of determination, he built a successful restaurant in Milwaukee that has become a meaningful part of the community. His dedication, long hours, and commitment to serving others are qualities I have always admired.

Beyond his work ethic, Stelio has always been the person who could make everyone in the room laugh. He has a wonderful sense of humor and a personality that naturally puts people at ease. Our family has always joked that he is really the biggest teddy bear. His kindness, warmth and generous spirit have always stood out to me.

When I got married, Stelio immediately made my wife feel like she was part of our family. He welcomed her with open arms and that is simply who he has always been, someone who makes people feel accepted and valued.

He has always been loving and supportive toward my family. My 10 year old daughter affectionately calls him "Stelio bear", a nickname that reflects the special bond they have shared over the years. In all the time I have known him, I never personally observed behavior that

caused me concern. I understand that my experiences do not change the facts of this case, but I hope they provide the Court with a fuller picture of the person he is.

Since his conviction, I have seen Stelio accept responsibility for his actions. He accepted the guilty verdict and has been participating in counseling while incarcerated. While I understand that these steps do not erase the harm caused, I believe they demonstrate a sincere effort to take responsibility and begin the process of personal change.

I know that nothing written in this letter changes the seriousness of the offense or the impact it has had. I simply ask the Court to consider the whole person before sentencing- someone who has been a devoted family member, a hardworking business owner, a generous supporter of Veterans and his community and a person who has begun taking responsibility for his actions.

Finally, I respectfully ask the Court, if it is within its authority, to consider recommending that Stelio be placed at a correctional facility as close to his family as possible. Our family remains committed to supporting him as he continues counseling and works toward rehabilitation. Being able to maintain regular visits and family connections would mean a great deal to all of us, including my daughter who misses her “Stelio Bear” very much. I believe that maintaining these family relationships will provide meaningful support as he continues to accept responsibility and work towards positive change.

Thank you for your time, your consideration and the difficult responsibility you carry. I respectfully ask that you consider these aspects of Stelio’s life as you determine an appropriate sentence.

Respectfully,

Jason Blank

John A Nasett
319 Halcyon Place
Fort Atkinson, WI 53538
9203976583
3Hrepair@gmail.com

**First Baptist Church**
David Neal, Pastor
Cell: 920-747-9013
920-563-5222
www.firstbaptistfta.org
firstbaptistfta@gmail.com
420 Whitewater Avenue • Fort Atkinson, WI 53538

08.06.2026

The Honorable Judge James Peterson
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Re: Character Letter for Stelio Kalkounos

Dear Judge Peterson,

My name is John A Nasett, and I am a minister at Jefferson County Jail. I have known Stelio through our Sunday morning Bible studies for two years. I am writing to provide a character reference for Stelio Kalkounos and to respectfully ask the court to consider the following when determining an appropriate sentence.

From my contact with Stelio and other inmates who regularly attend our Bible study I deem him to be an honest, respectful and caring person of faith. I have seen many of these same qualities expressed in deeds on a weekly basis.

I do not know his specific charges as he has never mentioned them, but he has often mentioned his culpability and regret. Stelio is always happy to see us on Sunday mornings and when our time together is over, he always says, "Thank you guys for coming, it really means a lot to me." A few weeks ago a new attendee (to our class and to life in the JCJ) asked how to contact his family. Stelio immediately told him how to use the tablet in his cell to make requests and ultimately how to contact his family. On another recent occasion a different man (not familiar with how to do things at JCJ) asked if he could get a Bible to keep in his call. Again, Stelio was the first to tell him to make his request to a deputy after being released from our class. The last thing I will mention is that Stelio says (after he thanks us for coming) is "You guys are in my prayers every night."

Stelio knows he will be going to prison because of what he has done. It seems he is looking forward to more freedom to use his abilities to serve others. He has told me he wants to work in two departments if possible…the kitchen and the chaplaincy.

I respectfully ask the court to consider Stelio's age, strong family connection and his potential to once again become a caring conscientious member of society both inside and outside of the prison system. I plan to continue to provide spiritual and moral support to Stelio after his sentencing.

Thank you for your time and consideration of this letter.

Sincerely,

John A Nasett

John N. Skoubis
1990 E. Algonquin Rd., Ste. 230
Schaumburg, Illinois 60173
Email: john@salawchicago.com

July 29, 2026

The Honorable Judge James Peterson
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Re: Character Letter for Stelio Kalkounos

Dear Judge Peterson,

My name is John N. Skoubis. I have been a close friend of Stelio's family and have known Stelios since his childhood. I am writing to provide a character reference for Stelio Kalkounos and to respectfully ask the Court to consider the following when determining an appropriate sentence.

Since I have known Stelio, he has been a family oriented, hardworking individual. He has always demonstrated a willingness to learn and adapt to circumstances which has allowed him to excel as a gifted restauranteur.

I had the pleasure of working closely with Stelio when I invested in a restaurant of my own and asked him to act as a consultant. He immediately implemented operational systems and established a rigorous training program for the employees which helped us efficiently operate and properly track all aspects of the business, demonstrating his extensive knowledge of the restaurant industry. His patience and follow-through was exceptional and helped foster confidence in and adoption of his plan by the employees and management. His kindness to all and availability to discuss and work out issues went above and beyond expectations.

One specific example of his exceptional skills was demonstrated when management wanted to continue to operate for lunch and dinner. Based on Stelio's analysis and experience, he was able to recognize that closing for lunch, although it would have a negative effect in the short-term, would result in greater efficiencies and profitability in the long term. Thankfully, he was able to convince management and ownership to adopt his recommendation which helped facilitate the success and profitability of the business.

Stelio's upbringing in a Greek immigrant family, witnessing first-hand the financial struggles and work ethic, coupled with the love and support of his tight-knit family helped shape and influence his character and personality which, in turn, contributed to his own success later in life.

I respectfully ask the Court to consider the Stelio Kalkounos I have known—a man who built a life of genuine service, unselfishly offered his time and expertise to help family and friends, and who is capable of continuing to do so. I am committed to supporting him when he returns, and I am confident he will make the most of whatever opportunity the Court gives him.

Thank you for your time and consideration of this letter.

Sincerely,

John N. Skoubis

**647 W Palatine Road**

**Palatine, IL 60067**

**August 9, 2026**

**To Whom It May Concern,**

I am writing this letter of recommendation on behalf of Stelio Kalkounos, whom I have known personally over 30 years. Throughout the time I have known Stelio, he has consistently demonstrated exceptional integrity, commitment to family and friends and is just an all-round genuine guy.

One example of how Stelio is committed to his friends is when I had my first son 15 years ago. Stelio came to visit my wife and I the next day in the hospital and brought us a pizza. The nurses made a comment to how thoughtful that was of him to do.

He has always loved his family and friends more than himself. He truly is the guy that would help someone out in need.

Sincerely,

**Marc Kane**

847-707-8855

marckane@aol.com

Hello Judge Peterson,

My Name is Choua Xiong. I am Stelios' assistant at The Five' O clock Steakhouse. I have been with the company for 7.5 years I work beside Stelio five days a week 9-5 and his dedication to this restaurant is 100 percent. I see his kindness to others and the way he works. When there is an employee in need of help, whether its money, emotional support, or any other issue he goes out of his way to make sure they are taken care of and I know this for a fact working beside him every day.

Every Thursday morning, he would go to his AA meetings I see him come and go when I arrive at work. He has a very close relationship with his sponsor as he was the one who would pick Stelio up for these meetings.

Some of the employees that he has here have also been through AA. Time after time when they mess up, Stelio will still be there for them and give them chances. There is one employee here that has been with the company for about 10 years. When she first started, she relapsed a lot. Yet Stelio would hold her position whenever she got clean and came back. Now ten years later she is still with the company, she's clean and one of our BEST and knowledgeable servers.

Stelio has a very strong support system. I would have to say I am closer to his family now than ever and have got to know them. I have also met some of his friends and got to know them as well. They are all very supportive of him and this situation. We will do everything we can do to support him, including myself.

Stelio is not just my boss; he is my good friend. I know all sides of him, when it comes to work, family, friends he is one of the kindest people that I know and will be there to help in a second. One thing I always like to say about stelio that he does that makes me feel unjudged is; English is my second language, and my spelling isn't the greatest. Every time that I do not know how to spell a word, I will ask him and he will stop what he's doing, spell the word for me with no questions asked, no judgement. I know it is small but it's the small things that he does for people too that makes a big difference in someone's life.

Thank you for considering my letter.

Choua Xiong

Choua Xiong

Scanned with MOBILE SCANNER

Jim Carlsen
1169 Heather Ln
Inverness, IL 60067
847-980-0339
accucare9@comcast.net

August 12, 2026

The Honorable Judge James Peterson
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Re: Character Letter for Stelio Kalkounos

Dear Judge Peterson,

My name is Jim Carlsen and I am a life long friend of Stelio Kalkounos. Myself and my family have been close friends for close to fifty years. I am writing to provide a character reference for Stelio Kalkounos and to respectfully ask the Court to consider the following when determining an appropriate sentence.

Stelio and I have grown up together not just as family friends, but I would consider him a brother. Our fathers were business partners in the restaurant business. Growing up we worked together washing dishes, dishing dinners and bartending. Stelio is probably one of the most level headed people I have ever known, even in our younger years. Growing up there was always a very strong sense of family between him, his brother and his parents. Whenever I would see him with any of them I could see the sense of love and loyalty to all of them.

Stelio as a person that I consider family, it has been great to see him become a successful entrepreneur, musician, but more importantly, an upstanding person in his community. He gives back to that community to those that are less fortunate. I have seen first hand how he would greet and talk to not only friends, but his customers and how well he treated all of his employees. He was always friendly and compassionate. He is someone that genuinely cares about how YOU are doing and what is going on in your life.

I am proud to call Stelio Kalkounos not only a friend, but proud to consider him a brother. I will always support Stelio no matter the situation. He has always been there for me without judgement and I will do the same for him. Stelio is a strong person and I know that whatever lies

ahead for him, he will persevere and become a better person from it. I respectfully ask the court to take these statements into consideration.

Thank you for your time and consideration of this letter.

Sincerely
Jim Carlsen

**Luis Reyes Aranda**
3853 S 74th St
Milwaukee, WI 53220
(414) 202-6259
luis_mi100@live.com

June 3rd 2026

**The Honorable Judge James Peterson**
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Re: Character Letter for Stelio Kalkounos

Dear Judge Peterson,

My name is Luis Reyes Aranda, Stelio and I are friends and have worked together for 12 years at Five O' Clock steakhouse. I am writing to provide a character reference for Stelio Kalkounos and to respectfully ask the Court to consider the following when determining an appropriate sentence.

Since the first moment I met Stelio I saw the great values he had, also the love and strength he had to make the restaurant great. Every day I saw how he cared for his employees and all the things he did for them and their loved ones.

When I started working for Stelio I had recently started a family with my wife and bought our first home. During that time the restaurant was not doing great so I was worried about my job and it was very stressful not knowing what was going to happen with the restaurant. Stelio quickly made changes and we all saw how the business was improving. He was more involved with everyone at the restaurant, communicating with all the employees to see how he could help and unite everyone in the workplace to make it a successful work environment. In time he also started helping the community by donating to many nonprofit organizations for example Street Angels which helps Milwaukee's homeless by providing food, clothes and other assistance to the unhoused of our city.

Stelio always took the time to ask about my family and see how we were doing. When I had my 3rd child he gifted us many baby supplies like diapers and baby clothes. I always felt like he cared about me and my family. During the holidays he always had something to offer so I could buy my children a

gift. Stelio loved to give so much to the people around him without asking for anything in return. Especially during those hard days at work, he took the time to invite me to dinner many times and just talk like friends. Personally I see him as a hard working person with a big heart and great values that his parents have instilled in him, someone that never gives up and someone that never gets tired of giving to the people that need it the most.

I respectfully ask the Court to consider the Stelio Kalkounos I have known - a caring man with a big heart that has helped the community for many years and I am sure he will continue doing so. I am committed to supporting him when he returns and I am confident he will make the most of whatever opportunity the court gives him.

Thank you for your time and consideration of this letter,

Sincerely,

Luis Reyes Aranda

| | |
|---|---|
| **To** | tnorthrop@hurleyburish.com Person Person Person |
| **Cc** | Person |
| **Bcc** | Person |
| **Subject** | Character letter for Stelio Kalkounos |

**PAMELA GRACE KARAHALIOS**

**7615 Surini Lane**

**Crystal Lake, Illinois 60012**

**dfwpgk@yahoocom**

**312-914-4040**

**August 27, 2026**

**Chief U.S. District Judge**

**James D. Peterson**

**Robert W. Kastenmeier Courthouse**

**120 North Henry Street Room 320**

**Madison, Wisconsin 53703**

**Re: Stelio Kalkounos**

**Dear Judge Peterson,**

**I am writing to you on behalf of my dear friend, Stelio Kalkounos, and his family. I have been a close friend of Stelio and his family for almost 40 years. During that time, I have had the privilege of watching Stelio and his brother grow from children into adults and then successful businessmen.**

**Throughout the many years I have known him, I have always known him to have a kind and considerate heart. On more than one occasion, I have seen the genuine concern in his eyes when a parent, family member or friend was ill or hurting in some way. He would stop whatever he was doing to see if there was anything he could do to help. I have personally experienced his kindness. Because I sometimes have difficulty walking, whenever Stelio was nearby, he would immediately offer me his arm and help me get where I needed to go.**

**Stelio's mother, Maggie, and his late father, George, provided Stelio and his brother with a loving and supportive family life. The bond within the Kalkounos family is exceptionally strong, and I know that bond will continue to sustain them as they face whatever obstacles lie ahead.**

**I do not write this letter to diminish the seriousness of the charges against Stelio. His family and I understand the gravity of the situation, and his family takes these charges very seriously. We understand that a punishment must be imposed. I respectfully ask, however, that you consider in mitigation that Stelio has admitted his guilt, is accepting responsibility for his actions, and has expressed great remorse for his conduct. Most importantly, he has a strong and loving family who will be there to support him and help him move forward on a better path when he is released.**

**I write this letter first and foremost as a friend. However, I feel compelled to mention that I served as a criminal court judge for more than 20 years and presided over hundreds of cases similar to this one. I have experienced firsthand the difficult balance a judge must consider when determining an appropriate sentence.**

**I would not write this letter if I did not feel strongly about Stelio and his family and believe that these circumstances are worthy of your consideration. I fully respect your responsibility and your discretion in determining the appropriate sentence. Whatever sentence you impose, I know that you will have carefully considered all of the aggravation and mitigation presented and that your decision will be just and proper.**

**Thank you for taking the time to consider my observations of Stelio and the Kalkounos family.**

**Respectfully,**

**Associate Judge (Retired)**

**Pamela G. Karahalios**

Restricted Information

Gilbert Duarte

Milwaukee, WI

7/22/2026

**To Whom It May Concern,**

I have had the privilege of knowing Stelio Kalkounos for 15 years as a chef at Five O'clock steakhouse, during which time I have observed his consistent integrity, reliability, and respectful demeanor. In both personal and professional settings, Stelio has demonstrated a strong moral compass, a commitment to his responsibilities, and a genuine concern for the well-being of others.

Throughout our association, I have seen him approach challenges with patience, thoughtfulness, and a willingness to listen. Stelio is dependable in fulfilling obligations, often going beyond what is expected to ensure that tasks are completed thoroughly and with care. Through personal experience and seeing his interactions with others are always marked by courtesy, empathy, and fairness, which has earned him great trust and respect of those around him.

I hold Stelio in the highest regard and believe his character speaks for itself through consistent actions and values. Should you require any further information or clarification, I would be pleased to provide it.

Sincerely,

Gilbert Duarte

Sts. Constantine & Helen Greek Orthodox Church
ΙΕΡΟΣ ΝΑΟΣ ΑΓ. ΚΩΝΣΤΑΝΤΙΝΟΥ ΚΑΙ ΕΛΕΝΗΣ
Rev. Fr. Panteleimon Dalianis
Metropolis of Chicago

August 3, 2026

The Honorable Judge James Peterson
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Re: Character Letter for Stelios Kalkounos

Dear Judge Peterson,

My name is Fr. Panteleimon Dalianis, and I am a parish priest who has known Stelio Kalkounos through the Greek Orthodox community for several years. While I would not characterize our relationship as extremely close, I have had sufficient opportunity to observe him in community and church settings and to form an impression of his character.

In my interactions with Stelio, I have consistently found him to be respectful, approachable, and deeply connected to his family, faith and community. One quality that has stood out to me is his willingness to give his time and attention to others without seeking recognition.

One particular aspect of Stelio's character that I have noticed is the importance he places on family and faith. In my experience, individuals who remain actively connected to their family, cultural heritage, and faith community often draw strength and accountability from those relationships. Stelio has consistently maintained those connections. It is evident to me that he has people in his life who care deeply about him, who will support him through difficult circumstances, and who will also encourage him to live up to the responsibilities expected of him moving forward.

I fully recognize the seriousness of the circumstances that bring this matter before the Court. At the same time, I believe it is important to acknowledge that a person is more than the worst decision he has made. What I have observed in Stelio is someone capable of reflection, growth, and positive contribution to the lives of others. I believe he has the support structure necessary to continue that growth and to rebuild his life in a meaningful and productive manner.

I respectfully ask the Court to consider the Stelio Kalkounos I have come to know: a man who remains connected to his family, community, and faith, and who possesses the capacity to learn from this experience and move forward in a positive direction. Should he be given the opportunity to do so, I am confident that he will have the support and accountability needed to make the most of that opportunity.

Thank you for your time and consideration of this letter.

Sincerely,

Fr. Panteleimon Dalianis
Protopresbyter

2160 N. Wauwatosa Ave, Wauwatosa, WI 53213 – Tel.: (414) 778-1555 – Fax: (414) 775-3029
Web: http://www.stsconstantinehelenwi.org – E-Mail: church@StsConstantineHelenWI.org

# BOBOT LAW OFFICE LLC

## VINCENT J BOBOT

August 3, 2026

RE: Character Letter
Stelio Kalkounos

I have known Stelio Kalkounos for approximately 20 years. I met Stelio through his father. At that time, Stelio's father owned and operated a supper club in the City of Milwaukee. Since then I got to know Stelio personally and professionally as one of his attorneys.

Stelio is a hard-working man. At his restaurant, he took pride in serving his customers and the community. I have attended several charity events hosted by Stelio. I found Stelio to be caring and thoughtful toward our community.

I firmly believe that Stelio deserves some consideration at sentencing. I can tell you his arrest for the charged crime has been devastating. Stelio had to scramble to keep his restaurant viable. During his lengthy incarceration, Stelio's father passed away. Stelio's lead attorney on his defense team also passed away. Stelio also had immense legal fees thrust upon him to garner legal representation. Finally, Stelio has accepted responsibility for his actions and now faces a lengthy prison term. Therefore, I respectfully request that you take these things under consideration when sentencing Stelio.

I want to thank you for your time and attention to this matter.

Sincerely,

V J Bobot

Vincent J. Bobot
524 E. Layton Avenue
Milwaukee, WI 53207
Phone: 414.282.9600
Email: vbobot@aol.com

July 29, 2026

The Honorable Judge James Peterson
U.S. District Court, Western District of Wisconsin
120 N. Henry Street, Room 320
Madison, WI 53703

Re: Character Letter for Stelio Kalkounos

It's my pleasure to write a letter in support of my friend Stelio Kalkounos.

We have been friends through business since Stelio took a leadership role in running the Five O'Clock Steakhouse. Our various businesses have been holding events there for more than 30 years. Stelio has shown us great generosity and integrity since day one.

We have also connected on a spiritual level. It has been we have exchanges Bible based materials, prayed together and done Bible study.

We will be there for our friend Stelio and available to assist as called upon with advice, counsel, possibly housing and with further recommendations to further support.

Sincerely,

Bob

Robert E. Conklin, Jr.
Conklin Real Estate Services, LLC
819 N. 23rd Street
Milwaukee, WI 53233
(414) 342-1550
(414) 342-1560 fax
(414) 791-5315 mobile
bob@conklinrealestate.com
www.conklinrealestate.com

ANDREASASSOCIATES LLC

LISA ANDREAS MSW, LCSW, CDBT, CSOTP

Clinical Psychotherapy, Mitigation Specialist

August 6, 2026

Joseph A. Bugni, Esq.
Hurley Burish, S.C.
33 East Main Street, Suite 400
Madison, WI 53703

Re: UNITED STATES OF AMERICA

v. 3:24-CR-00049-JDP

STELIO KALKOUNOS

**INTRODUCTION**

Dear Mr. Bugni,

Pursuant to your request, I conducted a forensic evaluation of Mr. Stelio Kalkounos regarding his current mental health status and risk for sexual recidivism, following charges of sexual offending behavior. The objective of this evaluation is to provide relevant clinical data and risk assessment metrics to inform the court regarding appropriate disposition and management.

I conducted an initial three-hour, in-person clinical interview with Mr. Kalkounos on June 17, 2026, at the Jefferson County Jail in Jefferson, Wisconsin. I subsequently conducted two follow-up interviews, each lasting two hours, via Zoom on July 14 and 17, 2026.

The responses to three focus questions are incorporated within this report:

1) To what extent do Mr. Kalkounos's past trauma, maladaptive coping mechanisms, and cognitive distortions act as drivers of his offending behavior, and how can these specific psychological factors be targeted in clinical intervention to reduce future risk?
2) Considering Mr. Kalkounos's previous completion of a treatment program, what type of subsequent treatment might be advantageous for him, and is he receptive to it?

6516 Monona Drive #156
Monona, WI 53716

Phone 608.237.8890 Fax 608.237.8891 andreasassociates.com

**Statement of Non-Confidentiality**

This clinician informed Mr. Kalkounos of the purpose of this evaluation and advised that, due to the legal nature of this assessment, the resulting report and its contents are subject to public disclosure. Consequently, he was advised that all information gathered through interviews and assessment methods was subject to the limitations of confidentiality and, therefore, not privileged. Mr. Kalkounos provided informed verbal consent to participate in the evaluation process. Based on his presentation, he appeared to understand the nature and purpose of the evaluation, and his participation appeared to be given knowingly, voluntarily, and without coercion.

I conducted two collateral interviews for this report. Collateral interviews are essential in a psychosexual evaluation to verify early developmental history and family dynamics. After I disclosed the non-confidential nature of the evaluation, the examinee's mother, Magdelyn Kalkounos, and brother, Andy-John Kalkounos, provided verbal consent and participated in separate semi-structured interviews. Both individuals participated willingly and demonstrated a clear understanding of the interview's purpose.

**Tools Used as Part of Evaluation**

1. Clinical Interview of Stelio Kalkounos
2. Phone Interview with Magdelyn Kalkounos and Andy-John Kalkounos
3. DSM-5-TR Self-Rated Level 1 Cross-Cutting Symptom Measure (Adult)
4. Minnesota Multiphasic Personality Inventory-3 (MMPI-3)
5. Hare Psychopathy Checklist-Revised (PCL-R)
6. Sex Offender Risk Assessment Framework (SORAF)
7. Garos Sexual Behavior Inventory (GSBI).
8. Wilson's Sex Fantasy Questionnaire (WSFQ)
9. Paulhus Deception Scales (PDS)

## PERTINENT PERSONAL BACKGROUND

**Family Composition and Home Environment**

Stelio George Kalkounos was born on April 25, 1973, in Fond du Lac, Wisconsin, and was raised in the northern suburbs of Chicago. He is the oldest child born to George and Magdelyn Kalkounos, who were married for 54 years. Mr. Kalkounos's brother, Andy-John, was born on February 25, 1975, and currently resides in Inverness, Illinois, where he operates four restaurants. Mr. Kalkounos recalls that his father's extensive involvement in managing multiple restaurants severely limited his presence in the home during his youth.

Most recently, Mr. Kalkounos (the defendant) resided in Milwaukee, Wisconsin, living in an apartment located directly above the Five O'Clock Steakhouse. This landmark establishment was a central piece of his family's hospitality legacy; in 2018, the defendant officially took over the enterprise when he bought the business directly from them.

Mr. Kalkounos describes his mother, Magdelyn (born February 14, 1952), as loving, caring, highly protective, and "brutally honest." She currently lives in Palatine, Illinois, where she works as a restaurant decorator. His father, George, passed away from cancer at the age of 75 on February

17, 2026. Despite his father's frequent absence during the defendant's childhood, Mr. Kalkounos remembers him with respect as a hardworking provider who did the absolute best he could to be a good father to his children. The defendant denied the presence of significant adverse childhood experiences.

Andy-John Kalkounos, the examinee's brother, was interviewed to provide collateral information regarding the family dynamics and the defendant's personal background. He described their parents' relationship as deeply affectionate, comparing them to "The Honeymooners" and noting that they could engage in intense verbal arguments with one another, yet they clearly loved each other.[1] He emphasized that these marital conflicts were strictly verbal, with no history of domestic violence in the home.

Andy-John characterized their mother as a passionate, tough businesswoman and the clear matriarch of the family, noting that she was the driving force behind their father's business image. During their youth, the brothers lived in an extended family household with their maternal grandparents, and their paternal grandfather would frequently stay with them when visiting from overseas. Andy-John recalled a lively household filled with food, music, and laughter, where family disagreements occurred but were ultimately rooted in love.

Regarding discipline and behavioral history, Andy-John reported that their mother utilized physical discipline, attempting to hit the children until they reached middle school. He noted a sharp contrast in temperament between himself and the examinee, describing himself as a "fighter," whereas the defendant was never violent. Instead, Andy-John described his brother as a "very nice, sweet nerd." Because of the defendant's gentle and non-confrontational nature, Andy-John expressed confusion regarding his brother's ongoing legal difficulties, stating that the family always expected Andy-John would be the one to get into trouble, and that no one expected this from the defendant.

In terms of personal interests and talents, Andy-John highlighted the defendant's deep passion for music and animals. He described the defendant as a highly talented musician who excelled at playing the piano, drums, and guitar, owned a large collection of instruments, and genuinely loved performing on stage. Additionally, according to his brother, the defendant demonstrated a profound attachment to animals; he cared deeply for his two dogs, and his intense grief and community connection were highlighted by the fact that approximately 100 people attended a wake held for one of his deceased pets.

**Clinical Impressions of the Kalkounos Family Environment**

From a psychological and clinical perspective, a childhood environment characterized by an absent but well-regarded father, a highly protective mother, and intense verbal marital conflict can significantly shape adult personality, coping mechanisms, and relationship patterns.

1. **The Impact of the 'Physically Absent, Economically Present' Father**

When a father is physically absent due to work demands but is framed as a "hardworking provider," children often develop complex emotional adaptations:

[1] The Honeymooners is a classic 1950s American television sitcom starring Jackie Gleason.

- **Rationalization of Emotional Neglect:** Children frequently rationalize the lack of emotional availability or physical presence by focusing on the father's work ethic. This can lead the child to equate love and worth with productivity, achievement, or financial provisioning in adulthood.
- **The 'Phantom' Role Model:** Growing up with a father who is highly respected but rarely there can create an idealized internal image of paternal authority. The son may feel a subconscious pressure to replicate the father's professional stamina (e.g., taking over the family hospitality legacy) to earn validation or feel connected to him.
- **Delayed Grief and Ambivalence:** The recent passing of the father in 2026 likely triggered complicated grief. Mr. Kalkounos may have experienced a mix of profound respect alongside buried resentment or sadness over lost time.

2. **The 'Highly Protective' and 'Brutally Honest' Maternal Bond**
A mother described as deeply emotional, highly protective, and "brutally honest" suggests a potent maternal presence that likely compensated for the father's absence:

- **Enmeshment Risk:** In families where one partner is physically or emotionally absent, the remaining parent sometimes turns to the children—often the oldest—for emotional support or companionship. This can blur boundaries and lead to a sense of hyper-responsibility in the oldest child.
- **Sensitivity to Criticism:** A "brutally honest" parent can foster high resilience, but clinically, it can also instill a harsh inner critic. The individual may develop a hypersensitivity to perceived failure, judgment, or criticism from authority figures or partners.
- **Anxious-Attachment Tendencies:** High protectiveness can sometimes communicate to a child that the outside world is unsafe. This can lead to underlying anxiety or a need for high levels of control over one's immediate environment and businesses.

3. **Exposure to High-Conflict, Affectionate Marital Dynamics**
The brother's description of the parents as deeply affectionate ("The Honeymooners") yet prone to "intense verbal arguments" introduces a volatile emotional blueprint:

- **Normalized Volatility:** When intense anger and deep affection exist side-by-side, a child learns that relationships are inherently volatile. As an adult, they may struggle with emotional regulation, viewing explosive verbal conflict as a normal or even necessary component of intimacy.
- **Hypervigilance:** Growing up in a household with unpredictable, intense verbal shouting matches forces children to become hyper-attuned to changes in emotional temperature. The individual may have developed an acute ability to read rooms, micro-expressions, or shifts in mood to anticipate conflict.
- **Internalized Conflict Resolution Style:** Without exposure to calm, collaborative problem-solving, the individual may default to extreme responses under stress—either engaging in intense verbal defense or completely shutting down to escape the noise.

4. **Birth Order and the Family Legacy Burden**
As the oldest child who ultimately took over the central piece of the family enterprise (the Five O'Clock Steakhouse), specific systemic pressures apply:

- **Parentification:** Oldest children in high-work-hour families often step into a pseudo-parental role to help care for younger siblings or support the emotionally strained parent.
- **Identity Entrapment:** Living directly above the family business and buying it out suggests an identity heavily intertwined with family expectations. Clinically, this can result in a blurred distinction between "who I am" versus "what the family needs me to be," creating immense psychological pressure to maintain a legacy at the expense of personal well-being.

5. **Denial of Adverse Childhood Experiences**
Mr. Kalkounos denied being exposed to childhood adverse experiences despite being sexually assaulted and witnessing the dysfunctional discord in his parents' marriage.

- **Denial or minimization of childhood trauma** often acts as a necessary unconscious defense mechanism to protect the self, but clinically, it keeps the body trapped in a chronic state of unintegrated toxic stress. Over time, this unacknowledged trauma frequently manifests as severe emotional dysregulation, somatic or chronic pain conditions, persistent relationship difficulties, and an elevated risk for depression, anxiety, or PTSD.

**Developmental, School and Career Narrative**
According to the maternal report, Mr. Kalkounos's developmental history was unremarkable. The pregnancy was uncomplicated, and he achieved early developmental milestones within typical timeframes. He entered the school system at age five and successfully progressed through general education without the need for specialized support services.

Mr. Kalkounos graduated from William Fremd High School in Palatine, Illinois, in 1991. He reported maintaining an average academic performance overall, noting that his grades fluctuated depending on his interest in the subject matter. He attended standard education classes, received no formal academic modifications, and had no history of disciplinary actions or grade retention.

Historically, he excelled in highly engaging, creative, and interactive areas, demonstrating a strong aptitude for science, participating in sports, and actively pursuing music as a multi-instrumentalist in high school band classes. Conversely, he experienced significant difficulties with mathematics and with maintaining the motivation required to achieve high grades in other courses, noting a historical tendency to give up easily when facing academic frustration. While Mr. Kalkounos did not receive specialized academic interventions or accommodations during his K-12 education, he recalled suspecting an underlying attentional deficit at the time. He was subsequently and formally diagnosed with Attention Deficit Disorder (ADD) as an adult in 2005.

From a familial perspective, Mr. Kalkounos's brother, Andy-John Kalkounos, described him as highly popular and socially adept during his school years, noting that he was "the most well-liked guy in school" and possessed strong leadership potential. Academically, he was described as an average student who earned "fairly decent grades," estimated to be in the "B or C" range. In

contrast to his brother, Andy-John reported a history of behavioral difficulties and school expulsions due to fighting, while the defendant exhibited no discipline issues within the academic environment.

Mr. Kalkounos's brother noted that both parents worked seven days a week, resulting in a "latchkey" childhood. During unsupervised periods while their parents were at work, the siblings frequently hosted social gatherings at their home. Despite the lack of direct parental supervision, Mr. Kalkounos appears to have maintained adequate behavioral control and social conformity during his youth.

Following high school, Mr. Kalkounos attended Loyola University Chicago in Illinois from 1991 to 1995. He completed the majority of his coursework but ultimately withdrew two credits short of completing his degree to pursue employment opportunities, a decision he currently regrets.

His employment history began at age 13 when he worked as a dishwasher at his father's restaurant. Throughout his college years, he worked with increasing regularity within the family restaurant business. From 1996 to 2000, Mr. Kalkounos gained significant industry experience working for two major corporate hospitality groups in Illinois, including Lettuce Entertain You Enterprise from 1996 to 2000, and concurrent employment with the Gibson's Restaurant Group from 1998 to 2000. In 2000, he transitioned to his family's restaurant enterprise full-time, establishing a long-term career in restaurant management and operations.

## Substance Use History

**Early History and Escalation**
Mr. Kalkounos's history of substance use began during high school, characterized by episodic alcohol consumption at social gatherings to the point of intoxication. Upon entering college, his usage escalated significantly, shifting into a pattern of severe binge drinking primarily concentrated around weekends. This level of consumption caused functional impairment, including poor performance and problems at work or school. During this period, Mr. Kalkounos also experimented with cannabis. The clinical severity of his alcohol consumption during this phase is evidenced by an automobile accident in Rosemont, Illinois, wherein Mr. Kalkounos struck a light post while operating a vehicle.

**Occupational Stressors and Interpersonal Dynamics**
In the late 1990s and early 2000s, Mr. Kalkounos transitioned into a professional role working alongside his father, eventually co-founding and operating a restaurant. This professional arrangement introduced intense psychosocial pressure. Mr. Kalkounos describes a complex familial dynamic marked by a strong desire to seek his father's approval, juxtaposed against a family culture high in guilt-induction and hyper-criticism. His father frequently questioned his autonomy and professional decisions. Compounding these professional stressors, Mr. Kalkounos was involved in a long-term romantic relationship with a partner whose alcohol consumption exceeded his own, further normalizing and reinforcing heavy usage.

**Co-Occurring Disorders and Dependence**
Between 2002 and 2006, Mr. Kalkounos's substance use escalated into a pattern of severe alcohol dependence. In 2005, he suffered a physical injury involving a slipped lumbar disc. To manage chronic pain and seek psychological relief, he began combining alcohol with non-prescribed muscle relaxers and pain relievers. This pattern of polysubstance use became a primary coping mechanism to address symptoms of depression. This depressive state was exacerbated by the dissolution of a romantic relationship.

**Legal Interventions and Institutionalization**
The escalating dependence and self-destructive behavior culminated in a significant legal incident in March 2006, a period during which he experienced a crisis in mental health and acute distress. Consequently, in January 2007, he was remanded to the custody of the Federal Bureau of Prisons to serve a 35-month sentence.

**Remission and Sobriety**
After his release from federal custody in May 2010, Mr. Kalkounos experienced a brief relapse, which led to a traffic stop on suspicion of driving under the influence (DUI). This encounter served as a pivotal moment of clarity regarding his dependence. He subsequently committed to total abstinence, establishing a sobriety date of May 11, 2010. He has since maintained sustained, long-term remission from substance use.

**Clinical Impression of Substance Use History**
Based on the detailed timeline provided, the most likely clinical impression for Mr. Kalkounos regarding his substance use history according to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR), is:

- F10.21Alcohol Use Disorder, Severe, In Sustained Remission
- F11.21 Opioid Use Disorder, Moderate, In Sustained Remission

While Mr. Kalkounos historically met the diagnostic criteria for these disorders during the period of 2002–2006, he does not exhibit any active symptoms or diagnostic criteria for a substance use disorder at this time. Having maintained total abstinence since May 11, 2010, Mr. Kalkounos has achieved long-term, stable, and sustained clinical remission. His sixteen-year history of uninterrupted sobriety indicates an exceptionally low risk for future substance-related legal issues or behavioral relapse.

**Previous Criminal History**
Mr. Kalkounos was never adjudicated delinquent as a juvenile. In 2006, the defendant was involved in a federal case concerning a sexual act with a minor. There was no actual minor victim in this instance, as the individual involved was an undercover detective conducting a sting operation. This behavior was reportedly triggered by the emotional distress of an ended engagement, compounded by active substance abuse. Consequently, Mr. Kalkounos served 35 months of incarceration before being released on parole, which successfully concluded in 2018.

**Previous Psychological Treatment**
Mr. Kalkounos's treatment history reflects a long-term engagement with therapeutic services addressing attention deficit disorder (ADD) and compulsive sexual behaviors across multiple providers. From 2004 to 2006, the defendant attended individual therapy with Dr. Brad Olson, alongside a concurrent group therapy program located within the same business plaza; he reported this treatment was beneficial in managing his ADD and compulsive behaviors. Following this, from 2010 to 2013, Mr. Kalkounos participated in individual and specialized sex offender group therapy with an agency in Arlington Heights, Illinois. This modality successfully helped him confront his compulsive sexual behavior and practice transparency, though he noted a subsequent vulnerability in maintaining these skills post-discharge.
From 2013 to 2019, Mr. Kalkounos participated in ongoing treatment at Pathways Counseling Center located in Brookfield, Wisconsin. Clinical records from this agency were reviewed as part of this evaluation. Mr. Kalkounos's treatment regimen consisted of weekly offense-specific group therapy sessions, supplemented by individual sessions. Polygraph examinations were administered periodically to monitor compliance and assess behavioral transparency.

Group therapy provided a framework for evaluating insight, noting a baseline tendency to minimize past sexual misconduct. During an interview for this report, Mr. Kalkounos noted that the curriculum provided minimal guidance on developing healthy relationship skills. Therapeutic interventions focused predominantly on the following areas:

- Trigger Management: Identifying and managing internal and external triggers.
- Cognitive Restructuring: Addressing cognitive distortions and thinking errors.
- Relapse Prevention: Mitigating the risk of cross-addiction.
- Prosocial Development: Establishing healthy boundaries and supportive networks.
- Emotional Processing: Improving self-worth while addressing shame, loss, and isolation

A review of progress notes indicated no evidence of current danger to self, others, or property. There was no documented evidence of substance abuse. Mr. Kalkounos maintained an active role in the group process, demonstrating consistent therapeutic engagement. Progress notes document moderate to significant progress toward established treatment goals. Notable milestones include an increased willingness to seek external accountability, active utilization of 12-step meetings, and the implementation of healthier relationship patterns. No major setbacks or behavioral obstacles were reported during the treatment process.

Despite clinical improvements, it was observed that Mr. Kalkounos continued to encounter significant high-risk vulnerabilities that would necessitate long-term management. These risks included hypersexuality, attraction to minors, compulsive internet use, a history of secrecy, depression, anxiety, and poor self-care. Immediate high-risk triggers that could precipitate a relapse include elevated stress, obsessive behavior, pornography use, participation in online chat rooms, and boundary crossing. To counter the risks, Mr. Kalkounos developed and used a structured relapse-prevention plan. His active coping strategies included: accessing a designated support network, including friends and a 12-step sponsor; using grounding techniques such as music, prayer, and meditation; implementing cognitive-behavioral tools, including a decision matrix, positive affirmations, and thought-stopping techniques; avoiding known environmental triggers; and engaging in empathy challenges and maintaining healthy lifestyle habits.

Mr. Kalkounos was discharged from the Pathways program by mutual agreement, reflecting the completion of the primary program requirements and the determination that further intensive treatment within this specific structure was no longer indicated. To maintain clinical stability and ensure community safety, the following aftercare recommendations were advised: Professional Collaboration: Maintain ongoing communication between the supervising probation officer and the treatment provider. Peer Support: Require continuous participation in designated SOT aftercare groups and in community-based 12-step meetings. Maintenance Therapy: Utilize individual and group therapy on an as-needed basis to reinforce coping strategies and prevent regression.

Mr. Kalkounos also received therapeutic services from June 2018 to April 2019, involving the participation of Ryan Stahl, LPC, and Carol Seydewitz, LPC. According to existing records, he was diagnosed with Dysthymic Disorder. Following the initial assessment, Mr. Kalkounos engaged in a series of individual and group therapy sessions facilitated by Ms. Seydewitz. Documented session dates with Ms. Seydewitz include November 19, 2018, January 21, 2019, March 18, 2019, and April 15, 2019.

The primary focus of these therapeutic sessions was to address foundational emotional and interpersonal vulnerabilities, including pervasive feelings of shame, self-blame, concerns related to body image, and challenges in coping with loss. Clinical interventions also aimed to modify maladaptive behavioral patterns, such as reactions driven by fear and difficulties in establishing appropriate personal boundaries. To investigate these emotional triggers and foster enhanced self-awareness, the treatment employed a combination of group discussions and structured art therapy interventions.

Regarding treatment progress, records indicate that Mr. Kalkounos demonstrated a commendable increase in his awareness of personal boundaries and an improved capacity to recognize his specific emotional triggers. These positive developments led to collaborative clinical intentions to modify his formal treatment plan to better accommodate his evolving needs. Despite these accomplishments, his therapeutic progress was occasionally impeded by persistent life stressors and clinical challenges. Specifically, documented difficulties included the compounded effects of overwork, physical illness, and intense emotional reactions related to themes of loss and interpersonal relationships.

## Relationships and Sexual History

**Psychosexual Development and History**

Mr. Kalkounos reports a heterosexual orientation and identifies women as his sole sexual preference. Mr. Kalkounos's developmental history reveals multiple early sexual boundary violations and experiences of victimization. He reports childhood sexual abuse at age five, during which a babysitter enticed him into inappropriate physical contact. In early adolescence (aged 11 or 12), he was approached by a 15-year-old cousin for sexual purposes. At age 16, he engaged in a sexual relationship involving a significant power imbalance with a teacher in her 30s. Mr. Kalkounos estimates his first consensual sexual intercourse occurred at age 15. To date, he reports approximately 75 lifetime sexual partners. This history includes engaging in group sex on several occasions, specifically involving two females.

**Relationship History and Current Functioning**
His broader relationship history includes fewer than 20 significant partners, with the majority of these relationships lasting only a few months and a small minority enduring for years. Longest relationships were established with partners close to his own age. In past relationships, such as with his ex-fiancée, sexual frequency occurred every other day or at least twice per week. Regarding his handling of sexual rejection, Mr. Kalkounos notes that he might feel disappointed or wonder if something was wrong, but his overall history includes no incidents of experiencing or perpetrating violence during sexual encounters.

He is currently single but desires a healthy intimate partnership; he remains uncertain about marriage. He reports occasional age-related erectile dysfunction. His current masturbation frequency is two to three times per week. Prior to incarceration, he viewed pornography once or twice weekly, typically utilizing content featuring two women or a triad of one man and two women.

**Assessment of Non-Deviant and Deviant Sexual Interventions**
When assessed for deviant sexual interests and behaviors, Mr. Kalkounos denies any sexual thoughts involving children, voyeurism, exhibitionism, or sadomasochistic activities. He reports no history of engaging in sexual activity with animals, having sex in public, or frotteurism (the paraphilic practice of achieving sexual arousal or gratification by touching or rubbing against a non-consenting person, often in crowded settings such as public transportation or concerts).

**Cognitive and Emotional Coping Patterns**
In terms of cognitive and emotional patterns, Mr. Kalkounos denies experiencing uncontrollable or distressing sexual thoughts, and he reports no experiences with sexual tension marked by negative emotions like anxiety, power imbalances, or resentment. However, he acknowledges that he tends to think about sexual things when facing difficulties or when things go wrong. Masturbation frequency was historically higher—daily or every other day—between 2003 and 2005, a period he attributes to extra stress, substance use, and promiscuous behavior used to self-medicate during personal crises, including the illness of his father, the death of a pet, and professional setbacks. He began regularly viewing pornography in college, transitioning from magazines and videotapes to online content by the early 2000s.

Regarding his emotional history, Mr. Kalkounos reports being on the receiving end of multiple relational betrayals. He notes that instances of his own infidelity and promiscuity have resulted in significant feelings of shame and guilt, which were particularly pronounced following his first arrest.

**Clinical Impressions**
Mr. Kalkounos presents with a complex psychosexual history marked by significant early childhood and adolescent boundary violations, including experiences at ages 5, 11/12, and 16. These early experiences likely contributed to a pattern of hypersexuality and promiscuity earlier in adulthood, as evidenced by his report of approximately 75 lifetime sexual partners. This behavior peaked between 2003 and 2005, during which time he utilized sexual behavior, increased masturbation, and substance use as maladaptive coping mechanisms to self-medicate through acute

personal crises (e.g., parental illness, bereavement, and professional setbacks). This indicates a historical tendency to internalize distress and express it through sexually channeled behaviors when encountering life difficulties.

Presently, Mr. Kalkounos exhibits a stabilizing trajectory with regard to his sexual functioning and relationship goals. His more recent sexual behaviors (masturbating and viewing mainstream pornography 2–3 times per week) fall within normative adult ranges. He demonstrates mature insight into his past behavior, expressing profound shame and guilt regarding historical promiscuity and infidelity, emotions that acutely crystallized following his first arrest. Furthermore, he articulates prosocial, relationally grounded goals, viewing sex as a component of mutual attraction and a healthy relationship rather than a purely detached coping mechanism. He reports age-related physiological changes (erectile dysfunction) but handles relationship rejection without aggression or hostility, suggesting adequate emotional regulation in intimate contexts.

## INDEX EVENT

A federal indictment from the United States District Court for the Western District of Wisconsin, case number 3:24-CR-00049-JDP, was reviewed for this report. The indictment was returned on May 16, 2024, and charges Stelio Kalkounos with two main offenses:

1. **Sex Trafficking of a Minor (Count 1):**
   - Alleged conduct occurred from July 16, 2023, to March 1, 2024.
   - Mr. Kalkounos is accused of recruiting, enticing, and obtaining a minor ("Jane Doe") for commercial sex acts, knowing or recklessly disregarding that she was under 18.
   - Charged under 18 U.S.C. §§ 1591(a)(1), (b)(2), (c).

2. **Production of Child Pornography (Count 2):**
   - Alleged conduct occurred on November 20, 2023.
   - Mr. Kalkounos is accused of employing, using, persuading, inducing, enticing, and coercing "Jane Doe" to engage in sexually explicit conduct for the purpose of producing visual depictions, knowing these would be transported via interstate or foreign commerce.
   - Charged under 18 U.S.C. § 2251(a).

**Defendant's Account of the Index Offense**

Mr. Kalkounos reported a relapse in his recovery program that began around 2021 and escalated during a period of intense personal stress. This relapse involved a return to promiscuity, frequenting strip clubs, and using adult dating sites. He explained that these casual, mutually beneficial sexual encounters served as an unhealthy coping mechanism to avoid emotional stress, vulnerability, and the fear of rejection. He reported a history of multiple infidelities in past relationships, culminating in the recent termination of a significant romantic relationship, which he identified as a catalyst for his current avoidance of emotional intimacy.

During a period of heightened personal and professional strain in 2023, Mr. Kalkounos experienced a shift in his behavior. He met an individual online who initially misrepresented her

age as over 19. When she later disclosed that she was 17 and about to turn 18, Mr. Kalkounos engaged in cognitive rationalizations based on her apparent maturity and her physical resemblance to an ex-girlfriend. He admitted that his primary motivation was to pursue a non-emotional, regular sexual arrangement to avoid the psychological risks and potential breakups associated with traditional adult dating. Before meeting in person, Mr. Kalkounos and the individual used phone and video calls to establish mutual expectations for their arrangement. They subsequently met in person five times in the Madison, Wisconsin, area. After these meetings, Mr. Kalkounos proposed a public outing to Wisconsin Dells to celebrate what he believed was her 18th birthday. The individual [victim] declined these suggestions, which Mr. Kalkounos later attributed to her involvement with multiple other men.

Mr. Kalkounos stated that their face-to-face contact ended around mid-December 2023. In January 2024, the individual reached out via text to say she missed him and needed him as a provider and lover, but communication ended shortly thereafter. Mr. Kalkounos later learned that federal authorities had interviewed her about an unrelated case involving child exploitation. During that interview, she mentioned her contact with Mr. Kalkounos, which ultimately led to the investigation into the current case.

This behavioral pattern coincided with several compounding life stressors, including his father's cancer diagnosis, the loss of his dog, work stressors, and the sudden departure of his band's singer. These events coincided with a breakdown in his support network when his sponsor (Dan H.) ended their relationship because Mr. Kalkounos missed scheduled meetings. He acknowledges that these pressures led him to abandon his recovery routines, lose his spiritual connection, and retreat into sexual fantasy. He has since re-engaged with his former sponsor and is actively participating in a 12-step program to address these behaviors and stabilize his mental and emotional health.

## CLINICAL EVALUATION AND RECIDIVISM RISK

### Behavioral Observations and Mental Status Examination

**General Appearance & Attitude:**
Mr. Kalkounos presented as his reported age of 53 years. He was dressed in a standard jail-issued uniform. His overall grooming and hygiene were reasonably neat and clean. During the interview, Mr. Kalkounos was cooperative, engaged, and willing to answer questions. He appeared motivated to participate, directing his best effort toward the assessment and interview process. Rapport was easily established and maintained throughout all sessions.

**Psychomotor Behavior & Speech:**
Observation of the defendant’s motor and speech patterns revealed no abnormalities. His psychomotor activity was calm, with relaxed posture and no evidence of tics, tremors, or abnormal involuntary movements. His speech was clear, coherent, and at a normal rate, rhythm, and volume, with no signs of pressure or halting.

**Mood & Affect:**
Mr. Kalkounos's subjective mood was described as situationally depressed, though not overtly so. His affect was appropriate and fully congruent with his reported mood and the topics discussed. He maintained good eye contact throughout the interview.

**Thought Processes & Content:**
Mr. Kalkounos's thought processes were coherent, linear, and goal directed. His thought content was generally within the normal range, though it was colored by expected minor situational anxiety and depression. He did not endorse any symptoms of delusions, obsessions, or paranoid ideation. Furthermore, he had no complaints or indications of obsessive-compulsive habits.

**Perception:**
There was no clinical evidence of perceptual disturbances. Mr. Kalkounos did not report experiencing auditory or visual hallucinations, nor was there any indication that he was attending to or responding to internal stimuli.

**Cognitive Functioning, Insight & Judgment:**
Gross cognitive screening during the interview suggested intact orientation and an adequate attention span. Mr. Kalkounos demonstrated the ability to comprehend complex questions and respond logically. His insight into his current legal and personal situation was good, and his judgment appeared sound and appropriate for the context.

For further diagnostic clarification, the **Minnesota Multiphasic Personality Inventory-3 (MMPI-3)** was administered. The MMPI-3 is a 335-item version of the MMPI designed to provide a comprehensive and efficient assessment of clinically relevant variables, with updated item scales and norms.

Updated for the first time since the mid-1980s and designed to align with U.S. Census Bureau demographic projections for 2020, the MMPI-3 normative sample includes 1,620 individuals (810 men and 810 women) ages 18 and older from diverse communities throughout the United States. The MMPI-3 builds on the history and strengths of the MMPI instruments to provide an empirically validated, psychometrically current standard for psychological assessment (Pona et al., 2023). The MMPI assessment is known for its robust validity scales, which help assess the accuracy and reliability of responses and detect potential issues such as faking, inconsistency, or defensiveness (Pona et al., 2023).

**MMPI-3 Evaluation Summary**

**Protocol Validity: High Cooperation and Situational Defensiveness**

- **Exceptional Cooperation:** Mr. Kalkounos demonstrated compliance and care in completing the evaluation. He answered all questions without omission (**CNS = 0**).
- **Attentive and Consistent Processing:** His responses were highly reliable and logical. His consistency scales (**CRIN = 57**, **VRIN = 64**, **TRIN = 54**) prove that he was attentive, took the test seriously, and did not engage in careless or random answering.
- **Adaptive Under-Reporting:** The Adjustment Validity scale (**K = 65**) shows an elevated response style focused on social desirability. In a high-stakes forensic environment, a T-

score of 65 is widely recognized as a normal, self-protective, and adaptive response. Rather than indicating intentional deception, it reflects a strong desire to present his best self, a high valuation of social approval, and a natural defensiveness given his current legal situation.

**Substantive Scales: Absence of Acute Pathology and Strong Self-Control**

- **Psychological Stability:** The defendant's substantive scales are entirely free of clinical elevations. This uniform, stable profile indicates an absence of acute psychiatric distress, severe anxiety, major depression, or thought dysregulation. He appears emotionally stable and resilient under the stress of legal proceedings.
- **Prospective Behavioral Control:** The profile highlights significant strengths in behavioral regulation. His scores on the Behavioral Dysfunction (**BXD = 54**) and Antisocial Behavior (**RC4 = 53**) scales are average.
- **Low Aggression and Impulsivity:** Most notably, the defendant scored well below the population average on Impulsivity (**IMP = 42**) and Aggression (**AGG = 35**). This indicates a highly controlled, non-confrontational personality style and a strong capacity for behavioral compliance.

**MMPI Forensic Conclusion**

Mr. Kalkounos's MMPI-3 profile describes an individual who is highly cooperative, emotionally stable, and free from active psychological illness. His elevated validity score **(K = 65)** is a predictable, situationally driven reaction to a high-stakes legal evaluation, rather than conscious deception (Sellbom, 2022).

When interpreted alongside his baseline functioning, the complete absence of clinical elevations—combined with lower-than-average scores in impulsivity and aggression—indicates that he possesses the psychological infrastructure for strong behavioral self-control, compliance with structured environments, and a positive orientation toward societal norms.

The **Hare Psychopathy Checklist-Revised (PCL-R)** is a well-validated instrument that reliably and accurately diagnoses psychopathy (Hare et al., 2000). By combining a semi-structured interview with comprehensive file reviews and collateral information, it effectively captures the distinct personality traits and behaviors central to the traditional concept of psychopathy. Because of this rigorous approach, the PCL-R is widely considered one of the most reliable methods for predicting institutional misconduct, re-offending, and future violent behavior (Holper et al., 2025).

**PCL-R Score Results**

A cross-battery synthesis of Mr. Kalkounos's psychological testing demonstrates a highly consistent, low-risk psychological profile. While his MMPI-3 profile exhibits a normal degree of situational defensiveness inherent to high-stakes legal evaluations (K = 65), the validity of his low clinical baselines is objectively corroborated by his performance on the Psychopathy Checklist-Revised (PCL-R). The defendant achieved a PCL-R score of 8, placing him significantly below the standard forensic average (20–24) and vastly below the diagnostic threshold for psychopathy (30).

Because the PCL-R relies heavily on objective institutional and legal histories rather than self-report alone, this exceptionally low score validates the flat clinical baselines observed on the MMPI-3. Together, these instruments confirm an absence of core predatory traits, chronic antisocial orientation, or emotional callousness. His significantly lower-than-average scores in impulsivity (IMP = 42) and aggression (AGG = 35) are structurally mirrored by his low PCL-R score. The data converge to describe an individual who lacks a psychopathic or antisocial personality structure, exhibits strong underlying behavioral control, and possesses a high capacity for institutional and societal compliance.

**Current Diagnostic Impressions**

Based on the objective testing and assessment data, other than the substance use disorders previously listed in this report, Mr. Kalkounos does not meet the diagnostic criteria for any other DSM-5-TR mental health disorder at this time. The psychometric data gathered directly refute these requirements across all major domains:

**1. No Evidence of Personality Disorders (Antisocial or Borderline)**

Given his history of underage sexual contact convictions, a primary concern in a forensic assessment is often Antisocial Personality Disorder (ASPD) or underlying psychopathic traits.

- **The Data:** His PCL-R score of 8 is vastly below the psychopathy threshold (30) and the standard forensic average (20–24). Furthermore, his MMPI-3 scores for Antisocial Behavior (RC4 = 53) and Behavioral Dysfunction (BXD = 54) are entirely average, whereas his Aggression (AGG = 35) and Impulsivity (IMP = 42) are notably lower than those of the general population.
- **DSM-5-TR Link:** He completely lacks the required DSM-5-TR criteria for ASPD, such as a pervasive pattern of disregard for the rights of others, impulsivity, aggressiveness, or consistent irresponsibility.

**2. No Evidence of Clinical Syndromes (Mood, Anxiety, or Thought Disorders)**

To diagnose disorders like Major Depressive Disorder, Generalized Anxiety Disorder, or Schizophrenia Spectrum disorders, a client must exhibit significant clinical elevations.

- **The Data:** On the MMPI-3, Mr. Kalkounos's Emotional Dysfunction (EID = 51), Thought Dysfunction (THD = 49), and somatic/cognitive scales are entirely flat.
- **DSM-5-TR Link:** He demonstrates no active criteria for any mood, anxiety, or trauma-related disorders, nor does he display any features of a formal thought or psychotic disorder.

**3. What About a Pedophilic Disorder?**

In cases involving underage victims, evaluators must consider Pedophilic Disorder (DSM-5-TR code 302.2). To diagnose Pedophilic Disorder, the DSM-5-TR requires over a 6-month period of recurrent, intense sexually arousing fantasies, urges, or behaviors involving prepubescent children, and the person must have acted on these urges or experience significant distress/interpersonal difficulty. Mr. Kalkounos does not meet these criteria.

## Sexual Recidivism – Actuarial Tools

An accepted measure of public risk is the use of research-based actuarial tools, which are commonly applied at various stages of the justice system. Sexual offender risk actuarial scales are developed through statistical analyses of groups of individuals with known outcomes—men who have been convicted of new sex offenses and men who apparently have not reoffended sexually. These analyses identify which items, known as "predictor variables," are most effective in distinguishing between those who reoffended and those who did not.

While risk assessment tools are typically used following an adjudication, they may also be applied in pre-adjudication cases involving filed criminal charges or corroborated allegations of sexual misconduct. Evaluators utilize these tools solely to estimate the probability of recidivism rather than to address the issue of guilt.

The **Sex Offender Risk Assessment Framework (SORAF)** consists of three tools: STATIC-99R, STABLE-2007, and ACUTE-2007. These tools are among the most widely used actuarial instruments for assessing sex offenders. They employ empirically demonstrated risk factors associated with sexual recidivism and provide explicit rules for combining them into a total risk score. The STABLE-2007 and ACUTE-2007 assessments have been found to enhance predictive power beyond that of static risk alone (STABLE-2007 and ACUTE-2007, n.d.).

The STATIC-99 was created in 1999 in the United Kingdom, and a slightly revised version (STATIC-99R) was released in 2003. The strengths of the STATIC-99 evaluations are that they use empirically demonstrated risk factors associated with sexual recidivism and provide explicit rules for combining these factors into a total risk score. The Static-99 risk assessment tool was updated again to include negative scores, specifically to improve the accuracy of recidivism risk assessments for older offenders. The update introduced negative points for offenders aged 40 and older, as empirical research showed they were significantly less likely to re-offend than younger individuals. The estimates of sexual and violent recidivism produced by the STATIC-99R can be considered a baseline of risk for violent and sexual recidivism (Helmus et al., 2022).

STABLE-2007 assesses 13 stable risk factors that correlate with sexual recidivism: significant social influences, capacity for relationship stability, emotional identification with children, hostility toward women, general social rejection, lack of concern for others, impulsivity, poor problem-solving skills, negative emotionality, sex drive and preoccupations, sex as coping, deviant sexual preference, and cooperation with supervision.

ACUTE-2007 assesses seven acute, rapidly changing risk factors that correlate with sexual recidivism. This scale consists of two main elements. The first element predicts sexual and violent reoffending, utilizing the following four risk factors: victim access, hostility, sexual preoccupation, and rejection of supervision. The second element predicts general criminal recidivism by including the aforementioned four factors along with emotional collapse, collapse of social supports, and substance abuse, resulting in a total of seven items.

Once ACUTE-2007 has been scored, this outcome is combined with the offender's STATIC-99R and STABLE-2007 scores to estimate an overall risk priority. The offender is classified as having low, moderate, or high risk for sexual and violent recidivism, and as having low, moderate, or high

risk for general criminal recidivism. Appropriate, empirically based risk ratios can then be applied to determine intervention priority.

| SORAF Risk Summary: Stelio Kalkounos | | | | | |
|---|---|---|---|---|---|
| STATIC | Low | Supervision Priority | Low | | |
| STABLE | Low | | | | |
| | | ACUTE Sex/Violence | Low | Current S/V Risk | Low |
| | | ACUTE General Rcvd | Low | Current Recd Risk | Low |

Mr. Kalkounos presents with an overall low risk for sexual and general recidivism, supported by minimal historical and current behavioral risk indicators. Actuarial testing indicates a **Low STATIC Risk,** meaning Mr. Kalkounos possesses few unchangeable, historical risk factors and a low foundational baseline for re-offending. Reflecting this baseline, case management metrics indicate a **Low Supervision Priority**, suggesting that Mr. Kalkounos does not require intensive monitoring or restrictive rules and that standard, low-level oversight is sufficient for safe community management.

This low historical risk is further supported by the stable day-to-day functioning and current behavioral presentation of Mr. Kalkounos. Assessment of stable dynamic factors—behaviors that change slowly over time, such as emotional regulation, coping mechanisms, and social networks—results in a **Low STABLE Risk** designation, indicating a prosocial and well-adjusted lifestyle. Furthermore, Mr. Kalkounos demonstrates a **Low ACUTE Sex/Violence Risk** and a **Low ACUTE General Recidivism Risk**. These scores reflect an absence of sudden, short-term destabilizers, such as intense emotional distress, hostility, or sudden changes in environmental access to victims, confirming that Mr. Kalkounos is currently stable and highly likely to follow rules and laws.

When synthesizing these historical and dynamic factors, the **Current Sex/Violence (S/V) Risk** and **Current Recidivism Risk** for Mr. Kalkounos are both determined to be **Low**. These final, integrated scores indicate a very low overall probability of future harm or return to criminal behavior. Consequently, these findings suggest Mr. Kalkounos is highly manageable in the community, and treatment intervention can further reduce his risk.

The **Vermont Assessment of Sex Offender Risk-2 (VASOR-2**; McGrath, Hoke, & Lasher, 2013) is a 14-item actuarial risk instrument designed to estimate the long-term likelihood of sexual and violent reoffending in adult males convicted of sexual crimes. The tool features a 12-item Reoffense Risk Scale to establish baseline recidivism probability and a 4-item Severity Factors Checklist to capture qualitative offense profile markers.

Empirical validation demonstrates robust psychometric properties for the instrument:

- **Reliability:** Inter-rater reliability is excellent, with an Intraclass Correlation Coefficient (ICC) of 0.88, indicating high scoring consistency across independent evaluators.

- **Validity:** Predictive validity is strong, yielding an Area Under the Curve (AUC) value of 0.74 for sexual recidivism, which reflects moderate-to-high statistical accuracy comparable to other mainstream forensic risk measures.

**VASOR-2 Score Results**
Mr. Kalkounos's score of 8 on the VASOR-2 (Vermont Assessment of Sex Offender Risk-2) indicates a **Moderate Risk** of reoffending. This means that Mr. Kalkounos has specific static (unchanging) risk factors, such as prior convictions or young age.

Test scores range from 0 to 22. Scores from 0 to 6 are in the low-risk range. A score of 8 falls into the moderate-risk range, which runs from 7 to 22. This moderate classification means the person shows several risk factors that correlate with sexual recidivism, which is the tendency to repeat a previous crime or behavior.

The VASOR-2 Severity Factors Checklist: This is a 4-item, clinically derived narrative checklist designed strictly to document the nature and severity of the crime. Based on the information in the indictment, two factors were checked on this list. While his risk tier does not change, recording a contact offense with actual or attempted vaginal penetration alters his clinical offense profile. Probation officers, institutional staff, and therapists use checklist markers—such as penetration—to design specialized safety, monitoring, and victim-avoidance plans.

**Sexual Cognitions, Attitudes, and Psychometric Profile**
As a part of the evaluation for this report, Mr. CLIENT completed the **Garos Sexual Behavior Inventory (GSBI).** The GSBI is a self-report measure designed to assist forensic specialists and mental health professionals in making assessments and treatment decisions about individuals with problems related to sexuality and sexual behavior. The GSBI's seven scale scores can be used to evaluate the cognitive, affective, and behavioral dimensions of a client's overall sexual adjustment. The GSBI can help to identify atypical or disordered sexual behavior and paraphilic interests, such as exhibitionism, sexual masochism, and voyeurism.

The GSBI contains a total of 70 items that describe a variety of sexual attitudes and behaviors. Responses are given on a scale ranging from 1 (Strongly Disagree) to 5 (Strongly Agree). Thirty-five items comprise the four main scales: Discordance, Sexual Obsession, Permissiveness, and Sexual Stimulation. Twenty-five items make up the three Masking scales: Sexual Control Difficulties, Sexual Excitability, and Sexual Insecurity. The GSBI is appropriate for use with adult clinical and correctional populations. Retest reliability estimates for GSBI scores range from .70 to .93 (median = .84), and evidence from factor-analytic, correlational, and classification studies supports the instrument's validity (Garos, 1999).

**GSBI Score Results**
When evaluating Mr. Kalkounos's GSBI profile, the quantitative findings are best understood within the framework of his upcoming federal sentencing. For an individual in his early 50s facing a second offense involving an age-discrepant partner (an underage female), the profile offers valuable insights into his current psychological coping style, behavioral strengths, and amenability to treatment.

First, the test's excellent internal consistency **(INC = 4)** demonstrates that Mr. Kalkounos possesses the cognitive focus and attention to detail necessary to complete complex, structured tasks successfully. His low-average scores on Sexual Disinhibition (DISC T = 50) and Sexual Permissiveness **(PERM T = 43)** suggest that in his general, day-to-day life, he values stability, structure, and conventional social norms. This indicates that his core personality is not defined by generalized chaos or widespread antisocial tendencies. Instead, his legal infractions constitute a highly circumscribed, situational vulnerability rather than a pervasive, unmanageable behavioral deficit.

His low level of reported internal conflict **(CONDIF T = 43)** and average excitement seeking **(EXCIT T = 49)** should be viewed constructively. Rather than indicating a total lack of insight, these scores likely reflect a protective psychological buffering mechanism commonly observed in individuals facing imminent, high-stakes legal outcomes. This suggests a desire to project stability and preserve social worth during a period of immense personal stress.

Furthermore, because the GSBI primarily measures generalized adult sexual behaviors, his normative scores on the **STIM (T = 41)** and EXCIT scales indicate an absence of hypersexual or sex-seeking behaviors in the broader community. His risk profile is highly specific and targeted, which significantly narrows and simplifies the focus of necessary clinical interventions.

From a rehabilitative standpoint, this profile is encouraging. It indicates that Mr. Kalkounos has a well-preserved capacity for behavioral regulation, responds well to structured environments, and aligns himself with conventional values. While his defensive testing posture must be accommodated in treatment—particularly by using evidence-based, non-confrontational modalities such as Motivational Interviewing—his high baseline level of behavioral control provides a solid foundation for successful risk management and long-term prosocial alignment.

The **Wilson Sex Fantasy Questionnaire (WSFQ)** consists of 40 examples of sexual fantasies. Respondents indicate how often they have a sexual fantasy, on a six-point Likert scale from 0 (never) to 5 (regularly). The fantasies are divided into four groups (exploratory, intimate, impersonal, sadomasochistic) with ten imaginative examples in each. According to research, "A particularly telling study is that of Hudson et al (2002). They gave a large battery of psychometric tests to men incarcerated for sexual molestation, in order to see which would predict recidivism after release. The WSFQ impersonal and sadomasochistic scores emerged as the best predictors, but only for pre-treatment scores (after treatment, the correlations disappeared)." (Wilson, 2016)

The sum of the respondent's score on all four types of imagination also gives a measure of how often the subject has sexual fantasies. A high overall score on the WSFQ indicates an active sex drive and a tendency to engage frequently with a wide variety of erotic thoughts. Rather than a cause for concern, it typically reflects an active libido and a healthy relationship with sexual pleasure. Isolated high scores in the Impersonal and Sadomasochistic domains are generally not considered a clinical concern on their own. However, if there is also sexual distress or impairment, hypersexuality, maladaptive personality traits, and endorsement of child-related items, this could be clinically concerning or indicate some degree of risk for problematic sexual behavior.

**WSFQ Score Results**

An analysis of the WSFQ results reveals a distinct clinical profile when comparing Mr. Kalkounos's scores against both standard Control populations and Child Molester (CM) reference groups. The data highlight a pronounced tendency toward exploratory and impersonal sexual imagery alongside an overall suppression of sadomasochistic, intimate, and passive/active operational themes relative to normal controls. However, when viewed through the lens of the CM reference cohort—which historically demonstrates heavy underreporting—Mr. Kalkounos's scores skew significantly higher across multiple thematic scales.

**Total Sexual Fantasy Output**

Mr. Kalkounos obtained a raw Total Fantasy score of 31. Compared to the general control population, this places him at the 30.96th percentile (Z-score of -0.50), indicating a total fantasy frequency slightly below average for the general population. However, when evaluated against the CM reference group, this exact same raw score jumps to the 68.12th percentile (Z-score of 0.47). This divergence suggests that while Mr. Kalkounos's overall fantasy generation is modest by standard norming criteria, it sits notably higher than the typical baseline seen in clinical or forensic populations where underreporting is standard.

**Analysis of Main Scales**

- **Exploratory Fantasies:** This represents Mr. Kalkounos's most elevated domain. With a raw score of 9, he scores exactly at the baseline for standard controls (50.57th percentile, Z-score of 0.01). When compared against the CM reference framework, however, this score places him in the 87.03rd percentile (Z-score of 1.13). This indicates a highly pronounced preoccupation with novel, unconventional, or exploratory sexual themes relative to the clinical group.
- **Impersonal Fantasies:** Mr. Kalkounos scored a 7 in this domain, which aligns closely with normal control averages (46.86th percentile, Z-score of -0.08). Yet, in comparison to the CM population, the score ascends sharply to the 80.03rd percentile (Z-score of 0.84). This reflects a strong comparative preference for sexual imagery detached from emotional intimacy or partner identity.
- **Intimate Fantasies:** Scoring 15 on this scale, Mr. Kalkounos shows a marked reduction in comparison to normal controls, placing him in the 20.29th percentile (Z-score of -0.83). Interestingly, this raw score brings him perfectly in line with the average clinical CM baseline, landing at the 51.63rd percentile (Z-score of 0.04). This points to an aversion to or a displacement of conventional, relationally intimate sexual themes.
- **Sadomasochistic Fantasies:** Mr. Kalkounos recorded a raw score of 0. This absolute zero places him well below normal control averages (25.36th percentile, Z-score of -0.66) and notably lower than the CM reference population average (33.91th percentile, Z-score of -0.42). Power-dynamic, dominant, or pain-inflicting imagery is entirely absent from the reported profile.

**Behavioral and Structural Themes**

- **Passive Fantasies:** A raw score of 2 positions Mr. Kalkounos significantly lower than normal controls (15.77th percentile, Z-score of -1.00) and at the lower third of the CM cohort (33.85th percentile, Z-score of -0.42).

- **Active Fantasies:** Similarly, a raw score of 3 demonstrates a depressed frequency of active-role imagery when contrasted with controls (22.35th percentile, Z-score of -0.76) and sits below the median for the clinical reference population (43.23rd percentile, Z-score of -0.17).

**WSFQ Clinical Interpretation and Defensiveness Context**
The reference metrics explicitly note that the average CM results exhibit a defensive footprint, characterized by widespread underreporting (as evidenced by negative clinical reference Z-scores across standard baselines, ranging from -0.49 to -0.87).

Given that Mr. Kalkounos's raw scores closely align with standard controls on the Exploratory and Impersonal scales, his relative metrics within the clinical CM framework ascend to the 80th to 87th percentiles. This pattern indicates that Mr. Kalkounos did not engage in an extreme level of defensive minimization commonly observed in forensic evaluations concerning exploratory or impersonal content. Nevertheless, the low scores related to relational intimacy, combined with the complete absence of sadomasochistic imagery, imply either a genuine disinterest in those thematic dimensions or a highly selective suppression of specific interpersonal and power-related dynamics.

When considering offender response bias, presenting oneself in a positive light can confound self-report surveys measuring attitudes or beliefs (i.e., Wilson's Sex Fantasy Questionnaire). Sex offenders, specifically child molesters, may be particularly susceptible to socially desirable responding because of the strong social stigma attached to their offenses. A commonly used method to assess response bias involves administering a socially desirability scale in conjunction with the measure of self-interest. For this report, the **Paulhus Deception Scales, (PDS)** was utilized to assess for socially desirable responding. The PDS includes 40 statements answered on a five-point Likert scale from not true (1) very true (5). The 40 statements divide equally to create two scales designed to measure conscious and unconscious response bias.

**PDS Score Results**
The test-taker's results on the PDS reveal elevated but valid scores overall, indicating a mild, conscious tendency to present favorably, yet lacking extreme faking-good behavior. Results vary moderately depending on whether general population or prison entrant norms are applied.

**General Population Norms**

- **Self-Deceptive Enhancement (SDE):** A raw score of 1 (\(T = 46\)) falls within the average range. The guideline suggests this response set is "Probably Valid." This shows the individual has an accurate, grounded self-image without unconscious biases to view themselves as unrealistically flawless.
- **Impression Management (IM):** A raw score of 10 (\(T = 60\)) indicates a mild elevation, flagged as "Possibly Invalid." This suggests a conscious effort to present themselves in a more socially desirable way to the examiner.
- **Total PDS:** A score of 11 (\(T = 57\)) is evaluated as "Elevated: but Probably Valid." The Estimated Marlowe-Crowne value is 16.28.

**Prison Entrants Norms**

- **SDE:** A raw score of 1 (\(T = 46\)) remains in the average range.
- **IM:** A raw score of 10 (\(T = 63\)) is moderately elevated compared to incarcerated populations, indicating a stronger situational drive to manage how they are perceived within the correctional or forensic environment.
- **Total PDS:** A score of 11 (\(T = 60\)) reflects an elevated index, though responses still yield usable profile data.

**PDS Interpretive Synthesis**
Mr. Kalkounos's elevated Impression Management score suggests some level of intentional effort to present favorably and minimize flaws. However, because his Self-Deceptive Enhancement (unconscious bias) is well within normal limits, they retain solid, grounded self-awareness. Consequently, while clinical and personality results should be viewed in light of their situational self-presentation, the overall evaluation remains broadly valid.

## SUMMARY AND TREATMENT RECOMMENDATIONS

**Recidivism Risk and Offense Context**
Clinically, analyzing how Mr. Kalkounos's psychosexual history intersects with his offenses highlights specific targets for intervention, revealing how past trauma, maladaptive coping, and cognitive distortions directly fuel his behavioral patterns. Although explicit deviant interest was not observed during clinical screening, Mr. Kalkounos's developmental history and established behavioral trends offer a framework for understanding the actions underlying these specific offenses:

1. **Re-Enactment of Childhood Boundary Violations (The Victim-Perpetrator Cycle)**
Mr. Kalkounos experienced significant psychosexual boundary violations at critical developmental milestones (ages 5, 11/12, and 16).

- **The Clinical Mechanism:** In clinical psychology, individuals who experience early sexualization or exploitation by older figures (such as a babysitter, an older cousin, or a teacher) frequently develop severe boundary distortions regarding age-appropriate sexual dynamics.
- **Nexus to Offenses:** This history can lead to a subconscious normalization or minimization of sexual behaviors involving minors. In the context of his current and past offenses, his past trauma may have impaired his cognitive appraisal of the absolute boundaries protecting minors aged 14 to 17, causing him to repeat or tolerate exploitative dynamics that mimic his own early history.

2. **Sexual Channeled Coping and Life Crises**
The evaluation firmly establishes a direct link between personal crises, acute distress, and an escalation into high-frequency sexual behaviors, substance use, and promiscuity.

- **The Clinical Mechanism:** Mr. Kalkounos acknowledged that he tends to "think about sexual things when things go wrong" and has historically used promiscuity and hypersexuality to self-medicate or escape painful emotional states.

- **Nexus to Offenses:** If faced with recent personal, financial, or psychological setbacks, his established behavioral trajectory dictates a regression into sexual outlets. This reliance on sex as a primary distress-regulation tool may have driven him to seek out increasingly novel or illicit sexual environments, ultimately involving him in the behavior as described in the indictment.

3. **Compartmentalization, Desensitization, and Pornography Progression**
Mr. Kalkounos has a multi-decade history of regular pornography consumption, transitioning from print media in college to online platforms by the early 2000s.

- **The Clinical Mechanism:** Chronic consumption of adult media often requires a progression toward increasingly specific or intense content to achieve the same psychological or physiological effect. Furthermore, individuals with excessive sexual partner counts (approximately 75 lifetime partners) frequently exhibit high sexual impulsivity and a compartmentalized view of sexual partners as objects rather than individuals.
- **Nexus to Offenses:** This long-term desensitization can erode moral and legal boundaries. The transition from viewing content to facilitating or producing live or recorded explicit material involving minors is clinically viewed as a failure of impulse control coupled with an escalated need for novel sexual gratification.

4. **Distorted Interpersonal Dynamics and Commercial Sex Normalization**
The evaluation notes that Mr. Kalkounos has historically viewed commercial adult environments as separate from standard relational boundaries.

- **The Clinical Mechanism:** A history of fewer than 20 significant relationships, paired with a high volume of fleeting encounters and insecurities stemming from being repeatedly cheated on, can deeply damage an individual's capacity for normative intimacy. This often causes a shift toward highly controlled, transactional sexual encounters.
- **Nexus to Offenses:** By relying on commercialized sex where power dynamics are inherently imbalanced, he may have rationalized participation in the current and past offense.

Mr. Kalkounos underwent a comprehensive psychosexual evaluation to determine his risk of sexual and violent recidivism. Mr. Kalkounos achieved a total score of 8 on the VASOR-2, which places him in the Moderate Risk category for reoffending. However, a granular analysis of the risk components reveals robust mitigating factors regarding his potential for high-risk behavior. Specifically, his STATIC (historical) risk factors, STABLE (dynamic/changeable) risk factors, and ACUTE (immediate/situational) risk levels for both sexual/violent behavior and general recidivism all evaluate to Low. There are no findings within this assessment to support a high-risk classification for sexual or violent reoffending.

A comprehensive risk assessment requires an analysis of the client's treatment history. Mr. Kalkounos previously participated in and successfully completed an offense-specific treatment program, yet subsequently reoffended.

There is an apparent paradox between the defendant's low psychopathic features (PCL-R = 8), his lower-than-average baseline impulsivity and aggression (IMP = 42, AGG = 35), and his repeated sexual offending. Clinically, this pattern indicates that the defendant's risk is not driven by an antisocial, chaotic, or predatory lifestyle. Rather, his risk is highly specific, covert, and encapsulated within a distinct paraphilic or situational cycle.

Mr. Kalkounos's elevated MMPI-3 Adjustment Validity score (K = 65) provides the psychological explanation for his past treatment failure. The defendant possesses a deeply ingrained response style focused on social desirability and the avoidance of psychological distress. In his previous therapeutic placement, this trait likely manifested as "institutional compliance" or "treatment mimicking."

**Treatment Recommendations**

A critical component of this psychosexual risk assessment is determining the defendant's amenability to offense-specific rehabilitation and his overall clinical prognosis. In forensic psychology, treatment amenability is heavily predicted by two factors: an individual's underlying characterological traits (specifically psychopathy) and their behavioral cooperation during the evaluation process. A synthesis of Mr. Kalkounos's low PCL-R score and high testing compliance indicates an exceptionally high degree of treatment amenability and a favorable prognosis for risk management.

His former structural and treatment protocols ultimately proved insufficient to deter his behavior; a revised management strategy is suggested. Future clinical interventions cannot rely solely on the client's self-report or subjective markers of progress. Instead, future treatment should be paired with environmental structure and objective monitoring mechanisms.

To bypass his defensive structure (K = 65), treatment providers must utilize objective accountability tools—such as regular Post-Conviction Sex Offender Polygraphy (PCSOP)—to mandate disclosure and verify compliance.

Furthermore, supervision must focus heavily on dynamic, immediate risk factors in his environment (e.g., access to victims, unmonitored technology), as his internal psychological self-reporting cannot be relied upon as an indicator of safety or relapse risk.

Mr. Kalkounos's historical track record of completing treatment, paired with his current GSBI profile, indicates several strong responsivity strengths. His low inconsistency index (INC = 4) and low-average sexual disinhibition (DISC = 50) demonstrate that he possesses the cognitive skills, behavioral stability, and capacity for compliance necessary to navigate structured institutional or community programs. He is highly capable of understanding program rules, maintaining attendance, and successfully meeting the objective and operational requirements of a treatment curriculum.

His high capacity for rule-following means his prognosis improves dramatically when clinical treatment is married to a structured federal probation oversight plan. In summary, Mr. Kalkounos possesses the psychological infrastructure and conventional baseline necessary to engage

productively in rehabilitation. While his history of re-offense demands a cautious clinical outlook, his demonstrated ability to complete programs provides a viable foundation for risk containment.

Highly confrontational therapy models are contraindicated. Instead, evidence-based, cognitively focused, and supportive modalities will optimize engagement and lower long-term risk:

- **Motivational Interviewing (MI):** To address the defensiveness and minimization indicated by his low CONDIF and PERM scores, treatment must be initiated with MI techniques. Rather than challenging his defensive posture directly—which frequently increases resistance—the clinician should meet his desire to present positively by aligning it with rehabilitative goals. MI will help Mr. Kalkounos explore the discrepancy between his stated traditional values and his actual offense history, fostering internal motivation for change without triggering a defensive retreat.
- **Cognitive Behavioral Therapy (CBT) for Offense-Specific Distortions:** CBT should be utilized to target the highly circumscribed cognitive distortions associated with his age-discrepant sexual interests. Because his profile does not indicate generalized hypersexuality, therapy must focus specifically on identifying and dismantling the rationalizations, justifications, and grooming behaviors used to access his minor victim. Exercises will focus on rewriting these distorted scripts and building absolute clarity regarding legal and developmental boundaries.
- **The Good Lives Model (GLM) / Strengths-Based Approach:** Operating on the premise that Mr. Kalkounos values stability and conventional social standing, the GLM framework is highly applicable. Treatment will assist him in identifying prosocial, age-appropriate pathways to fulfill primary human needs (e.g., connection, mastery, peace of mind). By focusing on building a "good life" incompatible with offending, the therapy leverages his natural inclination toward social conventionality to lock in long-term compliance.
- **Relapse Prevention and Risk Management (The RNR Model):** Utilizing the Risk-Need-Responsivity model, his treatment intensity should match his specific, targeted risk level. A highly structured Relapse Prevention plan must be co-created with Mr. Kalkounos. This plan will map out his specific behavioral chain, internal triggers, and external high-risk situations (e.g., access to digital platforms or environments frequented by adolescents). Given his demonstrated capacity to follow instructions and maintain internal consistency (INC = 4), he is an excellent candidate for strictly operationalized safety plans that involve clear, black-and-white behavioral rules.

Finally, a psychosexual assessment looks for verifiable internal changes and external stabilizing forces that could disrupt the cycle of sexual deviance. In a forensic framework, mitigating factors must directly address dynamic risk factors (variables that can change through intervention).

1. **Psychological and Internal Mitigation**

- **Absence of Pedophilic Disorder:** A comprehensive clinical evaluation established that Mr. Kalkounos's primary sexual orientation is toward consenting adults—rather than a fixed, preferential interest in children—which lowers his long-term risk profile.

- **Internalized Insight and Remorse:** Mr. Kalkounos demonstrates authentic insight into the cognitive distortions (rationalizations, minimization, entitlement) that allowed him to offend. This will allow him to understand his specific offense cycle and early warning signs.

2. **Behavioral and Substance Stability**

- **Prolonged, Documented Sobriety:** His 2006 offense was heavily fueled by active substance abuse. He has maintained sobriety since 2010.
- **Pro-Social Lifestyle Consistency:** The period between his release and the current offense represents a time where he successfully maintained stable employment, paid taxes, secured independent housing, and built non-deviant relationships. This proves he possesses the social skills necessary to live a crime-free life when properly supported.

3. **Environmental and External Controls**

- **Insulation Against Relapse:** A major dynamic risk factor for sex offenders is social isolation, which often leads to online seclusive behaviors or cognitive distortions. A supportive family acts as a powerful protective factor, insulating the client from the emotional isolation that frequently triggers lapses.
- **Age and Health Factors:** At age 53, the client falls into a demographic where sexual recidivism rates decline significantly. Statistically, sexual reoffending peaks in early adulthood and drops markedly after age 40 due to biological changes, such as decreasing testosterone levels and reduced sexual impulsivity.
- **Pro-Social Capital:** Running a successful business requires high executive functioning, emotional regulation, long-term planning, and positive social interaction. These skills demonstrate that the client can operate productively within society's rules when his deviant interests are not engaged.

If I can be of any further assistance or answer any additional questions regarding this matter, please do not hesitate to contact me.

Respectfully Submitted,

Lisa Andreas

Lisa Andreas MSW, LCSW, CDBT, CSOTP
WI License #9188-123

## Sources of Information

**Interviews**
Stelio A. Kalkounos, defendant
Magdelyn Kalkounos, defendant's mother
Andy-John Kalkounos, defendant's brother

**Records Reviewed**
Western District of Wisconsin Federal Indictments
Wisconsin Circuit Court Access (WCCA)
Pathways Counseling Center
Ryan Stahl, LPC, and Carol Seydewitz, LPC

**References**

Book, A. S., Clark, H. J., Forth, A. E., & Hare, R. D. (2006). The Psychopathy Checklist-Revised and the Psychopathy Checklist: Youth Version APA PsycNet. In R. P. Archer (Ed.), *Forensic uses of clinical assessment instruments* (pp. 147–179). Lawrence Erlbaum Associates Publishers.

Garos, S. (1999). *Garos Sexual Behavior Inventory (GSBI): Manual*. Psychological Assessment Resources.

Hare, R. D., Clark, D., Grann, M., & Thornton, D. (2000). Psychopathy and the predictive validity of the PCL-R: An international perspective. *Behavioral Sciences & the Law*, *18*(5), 623–645. doi.org<623:aid-bsl409>3.0.co;2-w.

Harris, G. T., Rice, M. E., Quinsey, V. L., & Cormier, C. A. (2015). *Violent offenders: Appraising and managing risk* (3rd ed.). American Psychological Association. doi.org. http://dx.doi.org/10.1037/pas0000390.

Helmus, L. M., Kelley, S. M., Frazier, A., Fernandez, Y. M., Lee, S. C., Rettenberger, M., & Boccaccini, M. T. (2022). Static-99R: Strengths, limitations, predictive accuracy meta-analysis, and legal admissibility review. *Psychology, Public Policy, and Law*, *28*(3), 307–331. https://doi.org/10.1037/law000035.

Holper, L., Ehrbar, C., Fancellu, F., Hauser, N. C., Habermeyer, E., & Mokros, A. (2025). Criterion Validity of the Psychopathy Checklist in Legal Contexts: An Updated Meta-Analysis. *Journal of Personality Assessment*, *107*(5), 547–562. https://doi.org/10.1080/00223891.2025.2469268

McGrath, R. J., Hoke, S. E., & Lasher, M. P. (2013). *Vermont Assessment of Sex Offender Risk-2 (VASOR-2) manual*. Robert J. McGrath

Pona, A. A., Marek, R. J., Panigrahi, E., & Ben-Porath, Y. S. (2023). Examination of the reliability and validity of the Minnesota Multiphasic Personality Inventory-3 (MMPI-3) in a

preoperative bariatric surgery sample. *Journal of Clinical Psychology in Medical Settings*, *30*(3), 673–686. doi.org

Sellbom, M. (2022). *Using the MMPI-3 in forensic psychological assessments*. American Psychological Association.

STABLE-2007 and ACUTE-2007. (n.d.). iResearchNet. https://psychology.iresearchnet.com/forensic-psychology/violence-risk-assessment/stable-2007-and-acute-2007/

Thornton, D., Mann, R., Webster, S., & et al. (2003). Distinguishing and combining risks for sexual and violent recidivism. *Annals of the New York Academy of Sciences*, *989*(1), 225–235. doi.org

Wilson, G. (2016). *Professor Glenn Wilson, Gresham College, talks about the Wilson Sex Fantasy Questionnaire*[Video]. Cymeon Research.

**Lisa Andreas MSW, LCSW, CDBT, CSOTP**
**6516 Monona Drive, #156**
**Monona, WI 53716**

## Education:

August 1989 B.A. University of Wisconsin-Milwaukee
*Major: Organizational Communication*
June 2002 (MSW) Madison University - Gulfport, Missouri
*Major: Social Work (Generalist)*
May 2017 (MSW, LCSW) University of Wisconsin-Madison
*Major: Advanced Social Work/Mental Health (WI License #9188-123)*
June 2022: *Dialectical Behavior Therapist (License #445916)*
August 2024: *Certified Sex Offender Treatment Provider (License #718147)*

## Employment:

**Andreas Associates, LLC**
*Sentencing and Mitigation Consultant, Forensic Social Work, Psychotherapist*
Private Practice; full-time (2003 - Current)
Business Address: 6516 Monona Dr., #156
Monona, WI 53716
Business Phone: (608) 237-8890
Email: landreas@andreasassociates.com Website: www.andreasassociates.com

Responsibilities:
- Preparation of independent pre-sentence investigations, psychosocial, psychosexual, dispositional reports, risk assessments, and other reports for criminal, juvenile, and federal court proceedings.
- DSM-5-TR assessment of mental illness, clinical impressions.
- Select and utilize actuarial tools based on client assessment and offense.

**Lisa Andreas, MSW, LCSW, CDBT, CSOTP**
*Psychotherapist – Private Practice*
2017 – Current
Business Address: 702 N. Blackhawk Ave., Suite 104
Madison, WI 53705
Business Phone: (608) 237-8890
Email: lisa@lisaandreaslcsw.com Website: lisaandreaslcsw.com

Responsibilities:
- DSM-5-TR assessment of mental illness, clinical impressions.
- Assess and coordinate client's treatment and other needs.
- Evaluate therapy sessions and outcomes and write reports.
- Keep abreast of developments in theory and research.

- Network within the health professional community and other potential business areas to maintain continuity of work and client base.
- Provide specialized psychotherapy (sex offender treatment, dialectical behavior therapy).

**Green/Lafayette Comprehensive Community Services (CCS)**
*Service Director*
2020 – 2022
N3152 State Road 81
Monroe, WI 53566
608-328-9353

Responsibilities:

- Clinical and administrative supervision of Green/Lafayette CCS programs
- Oversee client recovery treatment of all CCS consumers
- Teach principles of coordination of care and continuity of treatment
- Staff development and implementation of consumer recovery plans

**ATTIC Correctional Services**
*Clinical Group Facilitator*
2019 – 2020
1709 S. Park St., Suite 1
Madison, WI 53713
608-255-0307

Responsibilities:

- Facilitate psychoeducation, life skills, and sobriety groups for the Wisconsin Department of Corrections
- Complete intake assessments and ongoing documentation
- Case management

## Memberships:

2002 – 2026: National Alliance of Sentencing Advocates and Mitigation Specialists (NASAMS)
2005 – 2026: National Legal Aid and Defender Association (NLADA)
2014 – 2026: National Association of Social Workers (NASW)
2022 – 2026: Association for The Treatment & Prevention of Sexual Abuse

## Committee Appointments:

2005 – 2009: Wisconsin Sentencing Consultant Networking Group (Lead Facilitator)
2009 – 2010: McFarland Youth Court (Lead Facilitator)
2003 – 2005: NASAMS Conference Committee and Exhibitor Coordinator
2007 – 2008: Dane County Time Banks/Youth Court (Board of Directors)
2005 – 2014: Omega School (Board of Directors)
2013 – 2017: Dane County Youth Court (Advocate Judge)

2006 – 2010, 2014 - 2019: National Association of Sentencing Advocates and Mitigation Specialists (Board of Directors, Membership and Social Media Director)

## Trainings and Presentations:

2005: *Innovative Sentencing Strategies* – Dane County Criminal Defense Lawyers Association
2005: *Legal Writing Tips and Strategies* – Wisconsin Sentencing Professionals
2006: *Welcome Home* - Voices Beyond Bars
2007: *What is a Sentencing Consultant?* – Dane County Optimists
2009: *What Can a Mitigation Specialist Do for You?* – Federal Defenders Services of Wisconsin, Inc.
2013: *It's About the Story - Effective Defense Pre-Sentence Reports* – Dane County Criminal Defense Lawyers Association
2016: *Writing Sentencing and Mitigation Reports for Optimal Results, Record Gathering and Analyzing, 5 Signs You are Ready to Run your own Private Practice* – National Legal Aid and Defender Association
2016: *Working with Clients in the Criminal System* – National Association of Social Workers
2017: *Working with Clients in the Criminal System* – Wisconsin Association of Social Workers
*Best Practices for JLWOP* – National Alliance of Sentencing Advocates and Mitigation Specialists
*Investigation for Sentencing and Disposition* – National Alliance of Sentencing Advocates and Mitigation Specialists
2021: *Sentencing Advocacy: As if Their Lives Depended on It* – Wisconsin State Bar
2023: *Writing the Defendant's History, Essential Components* – Wisconsin Association of Criminal Defense Attorneys

## Partial Listing of Continuing Education, Specialized Clinical and Sentencing Training (2002-2026):

- Mastering Differential Diagnosis with the DSM-5-TR™: A Symptom-Based Approach: Margaret L. Bloom, PhD
- Dialectical Behavior Therapy Certification (C-DBT): Practical Clinical Applications for Trauma, Comorbidities, Addiction and More: Katelyn Baxter-Musser, LCSW, CDBT
- Department of Corrections Sentencing Grid – Accurate Calculations, Mitigating and Aggravating factors: Sharon Patrick, MSW
- MMPI-3 (Minnesota Multiphasic Personality Inventory) A New Norm, Overview: Yossef S. Ben-Porath, PhD
- RISB (Rotter Incomplete Sentence Blank) Administration and Interpretation: Pearson Assessments
- Report Writing – Effective Social History Presentation: Janet Dowling, LCSW
- SORAF – Sex Offender Risk and Need Assessment Framework: Gunnit Khurana, MS
- SCL (Symptom Checklist) 90R: Pearson Clinical

- CPORT-V2 (Child Pornography Offender Risk Tool)
- Restorative Justice: Harmon Wray, PhD
- Compulsive Pornography Use: Effective Treatment Options; James Messina, PhD
- Death Penalty Training Institute: Jill Miller, MSSW
- Introduction to Federal Court Sentencing: Daniel O'Brien, Esq.
- Working with Difficult Clients and Families: Vera Ockenfels, LCSW
- Sentencing Advocacy – A Legal Perspective: Judy Reed, Esq.
- Developing Motivational Interviewing Techniques: Jay Swoboda, MSW
- When Criminal Behavior is Symptomatic of Mental Illness: Mary Loeschler, PhD
- Working with Interpreters: Ana Maria Guzman Esq., Diana Daglelen Esq.
- Federal Sentencing Guidelines: Nancy Joseph Esq., William Burke Esq.
- Immigration Status: Consequences of Criminal Convictions: William Burke Esq.
- Investigation of Pediatric Head Injuries: Jeffery Jentzen, PhD, Robert Wells, PhD
- Interpreting Driving Records: Kent Buehler Esq., Janet Huggins Esq.
- Unlocking Military Records: Why Mitigation Specialists Need Them — and How to Get Them; Rita Williams BS, MCJ
- Sensory-Based Interview Strategies: Janice Stevenson, PhD
- Identification of Mentally Retarded Clients: Janice Stevenson, PhD
- Growing up after Childhood Trauma: Janice Stevenson, PhD
- Signs of Mental Illness in Offenders: Gregory Van Rybroeck, PhD
- Working with Victim's Families: Tammy Krause, MSW, Mickell Branhan, MSW
- Learning Disabilities in the Criminal Justice System: Nancy Cowardin, PhD
- The Use of Photographs and Videos in the Courtroom: Jill Miller, MSSW
- The Legal Defense of Adults & Adolescents with Asperger's Syndrome: Mark Olive Esq.
- Social History as a Science and Narrative: Mark Olive, Esq.
- Sexual Abuse of Male Clients: Richard Bourke, LCSW
- Personality and Risk Assessment Tools: Michael Cunningham, PhD
- Defense-Based Victim Outreach: Kelly Branham, MSW
- Navigating Military Culture & Systems: Lisa Rickert, MSW
- A Jury of One's Peers – Systematic Underrepresentation NAACP: Cessie Alfonso ACSW, LCSW
- Gathering Social Histories: Craig Haney, PhD
- Atkins Investigations – The Role of the Mitigation Specialist: Juliet Yackel Esq.
- Trauma – Symptoms, Effects and Dynamics; Frederic Sautter, PhD
- Emerging Trends in Sex Offender Treatment: Ashley Smith, LCSW-BACS, ACSW
- Cultural Influences on Behavior; Cessie Alfonso ACSW, LCSW
- Best Practices in Juvenile Transfers: Karen Rabin, LCSW
- Identifying, Communicating, and Assessing with Low Cognitive Functioning Individuals: Victoria Swanson, PhD
- The Dysfunctional Family, Identifying Strengths, Weaknesses, and Roles in Your Client's Family: Rebecca Ohler MSW
- Working with Gang-Involved Clients: Gregorio Estevane, MSW, Susan Cruz, MSW

- Cultural Considerations in Forensic Mental Health Assessment: Bruce Frumkin, PA
- No More Juvenile LWOP: What to Do to Win; Anna Bulkin LCSW
- JLWOP – The Critical Steps to a Reduced Sentence: Betsy Biben LCSW
- Restoring in Circle - The Implementation of Restorative Justice Circles in Federal Defense Practice: John Gehm, PhD
- Static-99R Administration and Interpretation: Anna Salter, PhD.
- Risk/Needs and Personality Assessments: Trap for the Unwary, or Tool for Advocacy: Jennifer Kamorowski, JD, PhD

# PSYCHOSEXUAL EVALUATION REPORT

## I Identifying information:

Name: Kalkounos, Stelio George
Birth Date: 04/25/1973
Age: 53
Evaluation Date: 07/02/2026
Criminal Case Number: 3:24-cr-00049
Jurisdiction: U.S. District Court for the Western District of Wisconsin

## II Synopsis:

a. Risk Level is Low
b. Amenability for treatment is excellent
c. Examinee is highly motivated for treatment. His self-efficacy regarding ability to engage in treatment is high. Despite guilt, remorse and high levels of shame about offending, he has a hopeful and positive impression of his capacity to learn from adversity and regulate his emotions to manage possible stress encountered in treatment.

He has expressed a strong interest in prosocial involvement in available group/leisure activities. There is a presence of medium and long-term healthy life goals. The examinee has excellent cognitive problem-solving skills to overcome common life difficulties. He exhibits a positive attitude toward change and maintaining a healthy lifestyle. To the extent he is able in his current situation, he views his own self as personally responsible for making the needed changes. He also views himself as capable of making the needed changes. He has an open and collaborative attitude toward authority. He has identified lifelong goals and interests (playing and composing popular music) and he will continue to do so for as long as he is able.

The examinee expresses and has access to his internal empathy; he has effective coping skills, considering his present situation. He presents with effective behavioral management and self-control skills, both present and past. He has a hopeful and persistent attitude toward positive change. He has effective socialization skills and he has definite insight in the understanding of managing risk factors for reoffending.

His immediate family has been and continue to be a source of support for him. Despite his father's recent death from cancer and the immense stressors on the examinee's family to manage their business, client has been able to maintain a deep and loving relationship with all family members. There is a presence of religious faith interwoven into the family system, and this sustains client and his loved ones during this challenging time in client's life.

III Referral for evaluation:

Examinee was referred by retained attorney to X. Milrod, PhD, LMFT, AASECT-CST, and evaluated by the undersigned, mainly due to Dr Milrod's doctoral degree in human sexuality, master's degree in clinical psychology, academic publication record and expertise in the commercial sex industry, sex trafficking, and in the psychological profiles of men who purchase sex. Dr Milrod holds licenses to practice marriage and family therapy in CA #39265 and NY #000481+D (diagnostic privilege), and is a certified sex therapist by AASECT (American Association of Sex Educators, Counselors and Therapists).

IV Assessment instruments:

a. The evaluation was conducted on a video conferencing platform, with evaluator verbally interviewing the examinee during 1 hr and 25 min, and two formal, psychometrically validated personality tests undertaken online by the examinee. The two tests were the personality factor test IPIP-300, and the so-called "Dark Triad," measuring levels of Narcissism, Machiavellianism, and psychopathy.

The IPIP-300 (also known as the IPIP-NEO-300) is a comprehensive psychological test based on the Big Five model of personality (Openness, Conscientiousness, Extraversion, Agreeableness, and Neuroticism). Developed by American psychologist and professor Lewis Goldberg, it evaluates these five broad domains along with 30 specific sub-traits (facets). Because it was designed as a scientific alternative to the commercial NEO-PI-R, psychologists and researchers frequently use it to better understand human behavior and preferences.
The assessment functions as follows:
The Structure: It consists of 300 statements where participants rate how accurately each statement describes them (usually on a 1-to-5 scale).
Time to Complete: It takes most people about 40 to 60 minutes to finish.
The Facets: Each of the Big Five domains is broken down into six distinct facets (for example, Extraversion is split into friendliness, gregariousness, assertiveness, activity level, excitement-seeking, and cheerfulness).
Public Domain: Unlike proprietary tests, anyone can use the IPIP items without paying royalties or licensing fees. This enhances the external validity of the test, since millions of subjects have taken the test, enabling vast amounts of scores uploaded for research interpretation and use worldwide.

The Dark Triad test is an 8 to 15-minute personality assessment that evaluates both the positive Big Five traits and negative sides of personality, providing personalized feedback on traits.

The "Dark Triad" portion of the assessment measures three socially aversive or inherently negative personality traits:

Machiavellianism: A manipulative, strategic, and cynical attitude that prioritizes self-interest and deception.
Narcissism: Characterized by grandiosity, pride, a sense of entitlement, and an constant need for superiority.
Psychopathy: Defined by high impulsivity, emotional callousness, a lack of empathy, and a remorseless disregard for the feelings or rights of others.

Percentage scores of entire tests are included with this evaluation. Interpretation of scores are included as supporting material to the interview.

Based on interview and testing, the completed Sex Offender Risk and Protective Factors Checklist documenting Static and Dynamic Factors has been attached to the evaluation.

V Confidentiality:

Examinee was provided with a description of procedures, consent forms (attached with evaluation) and provided written informed consent.

VI Mental Status Examination and Psychological Symptoms:

a. Examinee was interviewed by evaluator on defense counsel's Zoom platform at 4pm Central Time on July, 2, 2026. The interview lasted approximately 1 hour and 25 minutes. Testing by examinee was supervised by jail personnel who provided access to web browser and forwarded results to counsel, then evaluator.

b. Mr. Kalkounos was present at the appointment punctually. He was oriented x3 (time, place, identity). He presented as a neatly groomed man. He was alert and fully oriented. Mr. Kalkounos was socially appropriate and engaging. His mood was generally euthymic with congruent affect. Speech was normal for rate, prosody, and volume; speech was fluent with meaningful content, and no paraphasias or word-finding difficulties were observed. No dysarthria was evident. He presented as an open and accurate historian. He was able to recall recent and remote events in good detail. Thought processes were linear and coherent. Judgment and insight appeared intact. No evidence of hallucinations or delusions was noted during the interview. Hearing and vision were deemed adequate for testing and interview purposes. He denied experiencing emotional or physical distress during the evaluation. Gait and gross motor functioning were not assessed. Mr. Kalkounos comprehended test instructions and completed both tests. Rapport with evaluator was easily established and maintained throughout the interview. He responded appropriately to the challenges inherent to the sensitive and/or emotional elements of the interview, with a good tolerance for any misunderstanding or frustration. Based on his presentation and continued effort throughout the interview and the testing, the test results and interview responses were deemed to fully reflect his current cognitive and psychological functioning.

c. Mr. Kalkounos reports current anxiety and mild depression, consistent with symptoms and criteria of dysthymia, as per the DSM-5TR (Diagnostic and Statistical Manual of Mental Disorders, 5th edition, Text Revision) herein termed Persistent Depressive Disorder (PDD), plus attendant mood specifier "with anxious distress." It is a chronic form of depression requiring a persistently depressed or irritable mood for most of the day, for more days than not, spanning at least two years in adults. He has weekly sessions and a well-established therapeutic relationship with a female correctional counselor (LCSW). A correctional medicine physician, "Dr Ellison," manages client's psychiatric health, and has reportedly prescribed a non-habit forming anxiolytic, buspirone, as an adjuvant to the daily sertraline (SSRI) currently administered to client for control of PDD.

VII <u>Background, Social and Criminal History:</u>

Examinee had two "warm, loving parents" and a 2 year younger brother. Mother is now a widow. Parents were hard-working first generation Greek immigrants who first learned English in the US. Examinee was born in the US, learned Greek as a child, had a traditional public school education. Family business eventually expanded and parents were running 4 businesses at once. Examinee states he had a good childhood. He was not diagnosed with any disorders until into adult life, when a therapist diagnosed him with (ADHD) Attention-Deficit Hyperactivity Disorder. Examinee is not sure of the subtype. While in high school, examinee had a concussion during a sledding accident in 1989. Examinee was a diligent and above average student, went to college but dropped out 2 credits short of bachelor's degree in international relations and philosophy. He now understands that the focusing difficulties he had were mostly due to ADHD. From 13 years of age, he was inducted into the family restaurant business and gradually assumed greater responsibilities. He became very successful at running the family business and eventually ran his own steakhouse business as a young adult. He used his high earnings to pay for his interest in playing and composing popular music, as well as extend a $300,000 gift to his father and a loan to his younger brother for business purposes.

Examinee recalls participating in "only one boys' fight" in middle school. Later, examinee was robbed in a non-violent incident during college. Reportedly, examinee "messed around with cannabis a few times" during high school, but switched to alcohol during late high school and college. He began to have episodes of binge drinking, mostly to control his anxiety and panic attacks, which began in 1999. Examinee did not see a psychiatrist for this and instead persisted in using alcohol, which reportedly had a relaxing effect.

When examinee was released from prison in 2010, he went to AA, obtained a sponsor, and began practicing alcohol abstinence. He has now been sober from alcohol for 16 years, demonstrating the capacity for permanent change of behaviors.

In 2005, client was engaged to be married to a woman. In early 2006, after discovering that she was in another sexual relationship with her former boyfriend during the

engagement, examinee became depressed and despondent, began binge drinking, going to strip clubs, and mixing muscle relaxants with alcohol. It was the beginning of chat rooms on line, and client became a compulsive chat room user. In March 2006, examinee was arrested in a sting operation where a law enforcement officer posed as a minor. He never physically met the decoy, but was arrested on federal charges (since client was living in Illinois but crime crossed state lines), sentenced in November 2006 to 46 months in prison, with total time of incarceration 35 months, plus completed probation. He went from contemplating suicide, to successfully undergoing two separate sex offender treatment programs, one in Illinois 2010-2013, and another in Wisconsin 2013-2018. Examinee states they included healthy life skills, coping skills, and "the effects of unhealthy sexual behavior," although there was very little taught about "healthy sexuality." He also states he was shamed by the parole officer and failed several early polygraph tests due to the intense shame he was feeling. Examinee began feeling more positive in life and less depressed in 2016. He started a therapy group together with a therapist and engaged in therapeutic modalities such as EMDR and EFT, notably to address his own childhood sexual abuse victimization and that of other clients in the group.

<u>Sexual history/behavior:</u>

As previously reported, examinee details "a pretty good childhood," however, he also experienced CSA (childhood sexual abuse) at age 5, when a babysitter groomed him and taught him how to "touch her breasts." He did not understand the significance at the time, but did not mention this to another adult. When he was 10, an older female cousin began to do "role play" and telling examinee how to bring her to orgasm. As an adult, examinee began to understand the trauma and sexual abuse aspect of his developmental history, and in 2015 he engaged in group psychotherapy twice monthly, with some relief in trying to reframe the "horrible incidents."

Examinee reached adolescent sexual maturity at 16, and was again abused, this time by his 35 year old female high school computer science teacher, who invited client to her home and performed oral sex on him. At the time, examinee was confused and sometimes believed it was "cool," but stopped the behavior. Examinee entered into a conventional boyfriend-girlfriend romantic relationship with a female peer for 1.5 years. He had a relationship with a Greek-American girl in college, but ended the relationship due to her wanting to see "other people." There were other brief relationships in college and thereafter, but none longer than 2 years. And once the engagement broke off, examinee became "disillusioned" and began using substances and going into chat rooms, resulting in his first incarceration.

Examinee has no prurient interests, and his sexual fantasies are restricted to conventional male-female sexual behaviors. He is not interested in anal sex, BDSM, kink, fetishes, sex toys, or any deviant sexuality practices. He was once asked by a female sex partner to "smack her," and he felt extremely uncomfortable and would not do it. His masturbatory frequency is consistent with his age and experience, and he estimates this to be once or twice per week.

In 2022, examinee began experiencing a series of negative personal events. His dog died, the singer in the musical band he was playing in left the group, and a romantic relationship also ended. In addition, examinee lost a business opportunity to appear as a judge on Top Chef, largely due to his record of prior conviction. Examinee began a cycle of binge eating late at night and workaholism, then visiting strip clubs and engaging in remunerative compulsive sexual behavior. He became morbidly obese, weighed about 400 lbs.

Examinee first met victim on a so-called "sugaring" website where men enter into quasi-romantic relationships with women for financial consideration. Victim first claimed she was over 18, then told him that she would turn 18 in 3 months. He became infatuated and emotionally attached, and did not stop the relationship - rather, he made elaborate plans for victim and himself to celebrate her 18th birthday. Examinee states he wanted a long term relationship with victim, even though he knew she would never marry him, or stop asking for financial support. Victim told him she was "bisexual" and introduced him via text to her friend Violet. Examinee began sending sums of money to victim so that she could also "take care of Violet." Victim never told him that she also had "a boyfriend in college," and that she was also supplying him with some of the money examinee gave her.

Examinee believed that the conventional sexual behaviors occurring between victim and examinee were consensual. Even if victim would sometimes mention her "gag reflex," examinee would offer another $100 for her to engage in fellatio, and she would readily do it.

Examinee states he would do legal research on any person he would be attracted to confirm who they are and their legal age. He states he has always been attracted to women of legal age, sometimes very mature. Examinee dated a 50 year old woman when he was 33. He is now very skeptical about any age below 25. He is still hopeful about meeting someone once his incarceration is terminated. He now realizes that he was averse to challenging himself in relationships and he did not want to "make promises that could not be kept." He was hurt and wanted to avoid deeper relationships. He was doing well with his business and music, and he states he had "a blind spot and he allowed the 17 almost turned 18 to get taken in." Not being there for his family breaks his heart, and he states he will never forgive himself. He often sees his dead father in his dreams, and recently more so as the incarceration has gone on.

###

Dated and signed by Xtine Milrod, PhD, LMFT, AASECT-CST, on July 6, 2026
Evaluator

I anticipate testifying about the following issues as they relate to Sugaring as an established transactional segment of American dating practices:

The dynamics and practices of Sugar Baby solicitation of Sugar Daddies

A Sugar Baby is one half of a relationship intended to be distinctly and explicitly beneficial for both parties, the other party being a Sugar Daddy (or Sugar Momma, less common). Sugar Babies (usually cisgender heterosexual women) advertise their photos and bios on dedicated websites patronized by Sugar Daddies (cisgender heterosexual men with discretionary incomes, who wish to provide emotional and financial support for mutually agreed upon compensation. This can include strict cash payments but also indirect help with groceries, travel (not always with the Sugar Daddy), assistance with healthcare, etc. It is an understood arrangement of barter and the transactional aspects of the relationship do not minimize the ensuing emotional investment on the part of the Sugar Daddy, which is often crucial for the Sugar Baby to continue deriving benefits. There is a strict disavowal of any references to prostitution, or payments by the hour of both parties.

These dynamics and practices usually (but not exclusively) include older, more financially established men, with younger, attractive women. It is understood that the Sugar Daddy is not only a sexual partner, but often functions as a "mentor," and, by virtue of his age and financial security, often as a protector of sorts, called upon by the Sugar Baby to contribute to the solution of various Sugar Baby "problems," e.g., rent being late, sick parents, or needing any type of "intervention" requiring a financially solvent or otherwise knowledgeable older male with some power and ability to quickly marshal resources.

In these dynamics, the so-called Sugar Babies frequently fabricate and intentionally misrepresent identifying facts, including but not limited to descriptions of age, height/weight, and sexual preferences. In addition to posting photos that are often filtered or otherwise manipulated These relationships usually (but not exclusively) begin by matching on a Sugaring dating app. The Sugar Baby provides her profile and the potential Sugar Daddy contacts her on a mobile device.

The Sugar Baby often presents herself as a student with some aspirations but limited resources. There are great pains taken by the Sugar Baby to present herself as a single woman, without boyfriends or other younger men in her life. In order to derive benefits from the Sugar Daddy, the Sugar Baby agrees to a sexual relationship, since psychologically, the Sugar Daddy quickly becomes a "boyfriend surrogate," whether in his own mind, or following the narrative the Sugar Baby offers, in order to gain more resources. Once the Sugar Baby has secured the emotional investment of the Sugar Daddy, her demands often increase within multiple spaces of drawn out negotiations, all dependent on the emotional investment of the Sugar Daddy. However, from the Sugar Baby's perspective, the relationship need not be monogamous, whereas the Sugar Daddy often seeks exclusivity. Nothing prevents the Sugar Baby from engaging with multiple Sugar Daddies. She controls the pace, tenor and ultimate benefits of these relationships and the number of Sugar Daddies she needs to accomplish her goals.

This process is usually marked by the following characteristics

The Sugar Baby profiles and bios include non-pornographic photos intended to present her as an honest, aspiring member of society. There may be suggestive photos but no overt nudity. The Sugar Baby takes great pains to distance herself from any insinuations or suggestions of prostitution by the hour. The Sugar Baby begins her evaluation process of the Sugar Daddy by texting, then meeting in person, then usually proceeding to negotiating her terms (which are never disclosed in the profile).

Xtine Milrod, Ph.D.



<u>Emotional dynamics of the relationship</u>

The creation and maintenance of intimacy and communication styles of Sugar Babies interacting with Sugar Daddies is often marked by “terms of endearment” and “emotional labor” on the part of the Sugar Baby, to secure regular funding and also generate emotional investment by the Sugar Daddy, mainly for him to be compliant to the various demands that the Sugar Baby gradually imposes on him.

These interactions are not exclusively sexual and often take on forms of a relationship of emotional intimacy. The mentoring aspect of the sugaring relationship ensures that the Sugar Daddy feels involved in the Sugar Baby's life, and diminishes the transactional nature of the relationship.

Other aspects of the formation of this intimacy include an almost surrogate uxorious display by the Sugar Daddy, while the Sugar Baby reciprocates with displays of sympathy, encouraging the Sugar Daddy to "unload" his emotional woes, life stressors and even actual spousal relationship issues, while the Sugar Baby carefully listens and often offers soothing advice.

In the formation and sustaining of these relationships, it often involves negotiations of power, and there is often a fluid emotional dominance. These relationships are often not marked by submission by the Sugar Babies. Rather, the Sugar Baby can exercise dominance over the Sugar Daddy through many means, including but not limited to, these particular attributes:

The Sugar Baby understands her erotic and emotional capital, which often means that she controls access to her body and her time—always in return for financial compensation. Once the Sugar Daddy becomes emotionally dependent, the Sugar Baby often holds the withdrawal of herself from the relationship as a powerful motivator for the Sugar Daddy to comply with her demands. In the formation and sustaining of these relationships, there are often pecuniary and transactional aspects necessary for the Sugaring relationship to continue. These will often include the Sugar Baby sharing details of her private life, while occluding any presence of other male companions. The Sugar Daddy feels "included" and "important" in the Sugar Baby's life, often under the impression that other family members in the Sugar Baby's life are "aware" and "grateful" for his support.

Inherent within the sugaring relationships, there is no force or coercion of threats involved to sustain the relationship. Instead, it is one marked by the Sugar Daddy's increasing emotional dependence on the Sugar Baby. In fact, the Sugar Daddy may entertain fantasies of marrying or otherwise keeping the Sugar Baby for the rest of his life. This is common when the Sugar Daddy has no spouse or other non-remunerated female companions.

Xtine Milrod, PhD, LMFT, AASECT-CST

519 N. La Cienega Blvd., Suite #209, West Hollywood, CA 90048 (310) 281-9658
www.xtinemilrod.com / info@xtinemilrod.com